Commonwealth *v.* Redline, Appellant.

Argued May 28, 1957. Before JONES C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Joseph E. DeSantis*, with him *M. Bernard Hoffman*, for appellant.

*Peter F. Cianci*, Assistant District Attorney, with him *Frederick O. Brubaker*, District Attorney, for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, January 10, 1958:

The defendant was convicted of murder in the first degree with penalty fixed at life imprisonment for the death of his co-felon from a gunshot wound inflicted by a police officer endeavoring to apprehend the two culprits who were attempting to flee the scene of their armed robbery. From the judgment of sentence entered on the jury's verdict, the defendant has appealed

contending that he cannot, under any rational legal theory, be charged with murder for his accomplice's death since the killing was done by an officer of the law engaged in the performance of his duty and was, therefore, a justifiable homicide. Opposed to this, the Commonwealth maintains that the defendant is not only chargeable with murder for his confederate's death under the rationale of *Commonwealth v. Thomas*, 382 Pa. 639, 117 A. 2d 204, but, also, on the ruling in *Commonwealth v. Almeida*, 362 Pa. 596, 68 A. 2d 595, the proofs being that the defendant initiated and provoked the fusillade of shots one of which, admittedly from a policeman's gun, mortally wounded the co-felon.[1]

In the *Thomas* case, the defendant was held answerable to an indictment for murder for the killing of his accomplice by the victim of their robbery, the malice requisite being imputed because of the defendant's contemporaneous participation in the initial felony. The conclusion reached in the *Thomas* case was a further extension of the felony-murder doctrine as applied in *Commonwealth v. Almeida*. The opinion for the court in the *Thomas* case relied for its principal authority on the decision in *Almeida* and also cited the more recent case of *Commonwealth v. Bolish*, 381 Pa. 500, 113 A. 2d 464. But, *Bolish* is plainly distinguishable from *Almeida*, while the instant case, whose operative evidential elements are basically similar to those of the *Thomas* case, is distinguishable from both *Almeida* and *Bolish*. The decision in the *Almeida*

---

[1] Both the *Almeida* and the *Thomas* cases have provoked a large amount of critical law review comment and discussion. For a particularly well-considered and cogent criticism, see *The Felon's Responsibility for the Lethal Acts of Others* by Norval Morris, Associate Professor of Criminology at the University of Melbourne, in Vol. 105, U. of Pa. L. Rev., p. 50.

case was a radical departure from common law criminal jurisprudence; and the ruling should not be extended by still further *judicial* enlargement. A review of relevant authorities will so confirm.

The only constitutional power competent to define crimes and prescribe punishments therefor is the legislature, and courts do well to leave the promulgation of police regulations to the people's chosen legislative representatives. No killing under circumstances such as the instant case presents had ever before been declared murder in this State prior to the ruling in *Commonwealth v. Thomas,* supra. If predominant present-day thinking should deem it necessary to the public's safety and security that felons be made chargeable with murder for *all* deaths occurring in and about the perpetration of their felonies—regardless of how or by whom such fatalities came—the legislature should be looked to for competent exercise of the State's sovereign police power to that end which has never yet been legislatively ordained.[2]

The material facts of the instant case may be briefly stated. And, inasmuch as the jury's verdict rejected the defendant's self-exculpatory testimony, we shall accept the facts and circumstances of the robbery and killing as recited in the Commonwealth's counter history of the case.

Around midnight of April 11, 1956, Redline, the present defendant, and his companion, Erbor Worseck,

---

[2] It is not inappropriate to recall that the General Assembly of Pennsylvania, in prescribing by the Act of April 22, 1794, P.L. 186, punishment less than capital for certain types of murder, expressly recognized that "Whereas the design of punishment is to prevent the commission of crimes, and to repair the injury that hath been done thereby to society or to the individual, and it hath been found by experience, that these objects are better obtained by moderate but certain penalties, than by severe and excessive punishments . . ."

perpetrated at gun point a robbery of certain persons in the Midway Restaurant in Reading. During the course of the crime, two police officers were disarmed and held captive in the establishment. The defendant and his accomplice Worseck, fleeing the scene, compelled one Raymond R. Herschman to accompany them. Redline was the first to leave the building, behind him was Herschman and behind Herschman was Worseck. As they were departing, uniformed police officers outside bore down upon them. Redline, seeing one of the officers, shouted to him, "The man you want is in there [apparently meaning the building he had just left]." With that, Redline aimed a 45-caliber revolver at the policeman, who was then approximately fifteen to twenty feet distant, and fired point-blank but failed to hit his intended victim. Prior to this shot by Redline, there had been no shooting whatever. The policeman immediately returned the fire, and there then ensued a gun battle involving several policemen and the defendant and Worseck. During the course of the shooting, two policemen were seriously wounded, the defendant himself was wounded and so was Worseck. The latter's wound, which admittedly was inflicted by a bullet from a policeman's gun, proved fatal. It was Worseck's death for which Redline was indicted, tried and convicted for murder. As stipulated of record at trial, no bullet from the defendant's gun ever touched Worseck.

The above recited circumstances would, of course, support a serious criminal charge against Redline but *not for murder*. He was a willing participant in an armed robbery for which he could be indicted and found guilty at common law and, more lately in this State, under a pertinent statute. But, he is not chargeable under any known relevant rule of law, save for the decision in the *Thomas* case, supra, with murder for

the death of his co-felon. The question here involved calls for a complete review of the felony-murder theory.

The definition of murder at English common law, which was carried forward by our Act of January 28, 1777, 1 Sm. L. 429, alone defines the crime in this State. Consequently, in re-examining the felony-murder doctrine, both as to its origin and development generally and its application in Pennsylvania, it is to be kept in mind that, except for one special and presently irrelevant mode of death-dealing by means of intentional train-wrecking,[3] there is no *statutory* crime of murder in Pennsylvania. The so-called murder statute of this State is but a categorizing of common law murder into two degrees—a dichotomy still unrecognized in England whence the definition of murder as known and applied in Pennsylvania was derived. In fact, the General Assembly of this State was the first legislative body in America to divide the crime of murder into degrees (see Section 2 of the Act of 1794, supra). Since then, more of the other States of the Union have adopted similar statutes. See Keedy, A Problem of First Degree Murder: Fisher v. United States, 99 U. of Pa. L. Rev. 267 (1950).

Although degrees of murder were, and still are, unknown to the common law, three classes of homicide are there recognized, the term "homicide" being generic and embracing every killing of a human being by another: 1 Warren, Homicide, §54 (Perm. Ed.); IV Blackstone, Commentaries, *177. The classifications of homicide at common law are (1) justifiable, (2) excusable and (3) felonious. "The first has no share of guilt at all; the second very little; but the third is the highest crime against the law of nature that man is capable of committing": IV Blackstone, Commen-

---

[3] Section 919 of The Penal Code of 1939, P.L. 872, 18 P.S. §4919; see *Commonwealth v. Johnson*, 368 Pa. 139, 81 A. 2d 569.

taries, *178. A justifiable homicide is such as is committed either by command or, at least, with the permission of the law, e.g., execution of a convicted criminal, *apprehension of an escaping felon*, etc.; an excusable homicide is such as is committed either *per infortunium* (i.e., accidentally) or *se defendendo* (i.e., in self defense): IV Blackstone, Commentaries, *178-186; and a felonious homicide (i.e., murder) occurs when a person of sound memory and discretion unlawfully and feloniously kills any human being in the peace of the sovereign *with malice* prepense or aforethought, express or implied: see IV Blackstone, Commentaries, *195; 1 Warren, Homicide, §63; 1 Wharton, Criminal Law, §419 (12th Ed).

Such is substantially the definition of murder which this court adopted in *Commonwealth v. Drum,* 58 Pa. 9, and which has ever since been uniformly applied by this court in the multitude of murder trials that has followed: see, e.g., *Commonwealth v. Buzard,* 365 Pa. 511, 76 A. 2d 394. The proof requirements necessary to establish a case of murder, as defined in the *Buzard* case, are no different than they were at the time of *Commonwealth v. Drum,* supra. The "reasonable creature in being" specified in the common law definition of murder, as stated in the *Drum* case, was none other than the human being whose death at the hands of another is still necessary to constitute a homicide. "The distinguishing criterion of murder", as recognized in the *Drum* case, "is malice aforethought." And, that continues to be true today. Malice is the "grand criterion which now distinguishes murder from other killing": IV Blackstone, Commentaries, *198.

In certain circumstances the malice essential to murder need be neither prepense nor express. For instance, at common law an accidental or unintentional

homicide committed in the perpetration of or attempt to perpetrate a felony is murder, the malice necessary to make the killing murder being constructively imputed by the malice incident to the perpetration of the initial felony. Thus, "if one intends to do another felony, and undesignedly kills a man, this is also murder": IV Blackstone, Commentaries, *200-201. This type of felonious homicide, known as felony-murder, became firmly imbedded in the common law. It had its origin in antiquity. According to Morris, *op. cit. supra,* "There is, indeed, more than a hint of the existence of such a rule in Bracton's De Legibus et Consuetudinibus Angliae", circa 1256, and was developed "in its formulations through Coke, Hale, Foster, Blackstone and East . . ." A widely accepted and quite plausible explanation of the origin of the doctrine is that at early common law many crimes, including practically all, if not all, felonies were punishable by death so that it was of no particular moment whether the condemned was hanged for the initial felony or for the death accidentally resulting from the felony: see The Killer and His Victim in Felony-Murder Cases by Hitchler, 53 Dick. L. Rev. 3 (1948). But, the fact that murder continues to be the only capital offense in Pennsylvania makes the distinction as to felony-murder vitally significant. And, the trend generally has been to restrict rather than to expand application of the felony-murder doctrine. Indeed, in enacting the murder degree statute of 1794, supra, the Pennsylvania legislature constricted the penalty for felony-murder by imposing capital punishment only for such felony-murders as occurred in the perpetration of arson, rape, robbery or burglary.[4]

---

[4] The limitation so imposed by the Act of 1794 was carried over into Section 74 of the Act of 1860, P.L. 382. And, by Section 1 of the Act of May 22, 1923, P.L. 306, a fifth felony (viz., kidnapping)

All felony-murder in Pennsylvania other than such as is committed in the perpetration of one of the common law felonies specified in our *degree* statute is murder of the second degree by virtue of the express terms of that statute respecting "All other kinds of murder". It is plain enough that neither the Act of 1794, supra, nor any of its subsequent re-enactments made *all* homicides occurring in the perpetration of felonies murder of the first degree. Logically, therefore, the basic determination of the fact of murder is to be made according to the rules of the common law, including the felony-murder theory of imputed malice, and, upon a finding of guilt, the degree statute automatically raises the murder to first degree if it happened, inter alia, to have been committed in the perpetration of arson, rape, robbery, burglary or kidnapping: cf. *Commonwealth v. Kelly*, 333 Pa. 280, 284-285, 4 A. 2d 805.

In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing*. The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. "It is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony. Death must be a consequence of the felony . . . and not merely coincidence": Hitchler, *op. cit. supra*, citing Perkins, Malice Aforethought, 43 Yale L. J. 537 (1934).

The legal situation which for years obtained in this State in cases of felony-murder was aptly epitomized by Mr. Justice PARKER in *Commonwealth v. Guida*, 341 Pa. 305, 308, 19 A. 2d 98, as follows, ". . . if a person killed another in doing or attempting to do

was added. As so amended, the statute was later codified in Section 701 of the presently applicable Penal Code of 1939, supra.

another act, and if the act done or attempted to be done was a felony, the killing was murder. There was thus supplied the state of mind called malice which was essential to constitute murder. The malice of the *initial* offense attaches to whatever else the *criminal* may do in connection therewith" (Emphasis supplied). And so, until the decision of this court in *Commonwealth v. Almeida,* supra, in 1949, the rule which was uniformly followed, whether by express statement or by implication, was that in order to convict for felony-murder, *the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.* See, e.g., *Commonwealth v. Major,* 198 Pa. 290, 47 A. 741; *Commonwealth v. Grether,* 204 Pa. 203, 53 A. 753; *Commonwealth v. Lessner,* 274 Pa. 108, 118 A. 24; *Commonwealth v. Carelli,* 281 Pa. 602, 127 A. 305; *Commonwealth v. McManus,* 282 Pa. 25, 127 A. 316; *Commonwealth v. Lawrence,* 282 Pa. 128, 127 A. 465; *Commonwealth v. Doris,* 287 Pa. 547, 135 A. 313; *Commonwealth v. Tauza,* 300 Pa. 375, 150 A. 649; *Commonwealth v. Flood,* 302 Pa. 190, 153 A. 152; *Commonwealth v. Crow,* 303 Pa. 91, 154 A. 283; *Commonwealth v. Sterling,* 314 Pa. 76, 170 A. 258; *Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518; *Commonwealth v. Shawell and England,* 325 Pa. 497, 191 A. 17; *Commonwealth v. Stelma,* 327 Pa. 317, 192 A. 906; *Commonwealth v. Kelly,* 333 Pa. 280, 4 A. 2d 805; *Commonwealth v. Guida,* supra; *Commonwealth v. Frisbie,* 342 Pa. 177, 20 A. 2d 285; *Commonwealth v. Elliott,* 349 Pa. 488, 37 A. 2d 582; *Commonwealth v. Pepperman,* 353 Pa. 373, 45 A. 2d 35; *Commonwealth v. Wooding,* 355 Pa. 555, 50 A. 2d 328.

Until the *Almeida* case there was no reported instance in this State of a jury ever having been instructed on the trial of an indictment for murder for

a killing occurring contemporaneously with the perpe-
tration of a felony that the defendant was guilty of
murder regardless of the fact that the fatal shot was
fired by a third person acting in hostility and resistance
to the felon and in deliberate opposition to the success
of the felon's criminal undertaking.

On the contrary, in *Commonwealth v. Thompson,*
321 Pa. 327, 330, 184 A. 97, which involved a conviction
of first degree murder with penalty of death, the de-
fendant contended that the victim was killed by a
bullet fired by a neighbor in an effort to resist the
defendant's armed assault, while attempting to burglar-
ize the home of the deceased victim. On appeal to this
court, the defendant complained that "the trial judge
did not adequately present to the jury the evidence
in support of his contention that the bullet which killed
[the deceased] was fired from [the neighbor's] pistol,
but reviewed at greater length and with emphasis the
evidence supporting the opposite theory of the Com-
monwealth." In affirming the conviction, this court
said that ". . . when the statement complained of is
read with the preceding portion of his charge, it is
clear that the trial judge ... did not convey the impres-
sion that the doctor had testified the decedent died
from a gunshot wound inflicted by any particular
bullet or pistol. An examination of the charge in its
entirety discloses *very careful instruction that the jury
must be satisfied beyond a reasonable doubt that the
defendant's shot caused the death"* (Emphasis sup-
plied).

Again, in *Commonwealth v. Mellor,* 294 Pa. 339, 342,
144 A. 534, which likewise involved a first degree
murder conviction with the death penalty, the major
defense at trial was that the innocent victim of a
shooting in connection with an attempted robbery by
the defendant (and a confederate) was accidentally

killed by a bullet from a revolver of a police officer attempting to repel the robbers' felonious assault. In submitting the case to the jury "the trial judge charged that, if the jurors believed [the deceased] was killed by a shot from [the policeman's] revolver, [the defendant] should be acquitted." And, this court, in an opinion by Mr. Chief Justice Moschzisker, impliedly approved the instruction.

The rule thus expressed and followed in Pennsylvania prior to the *Almeida* case was the same in other common-law jurisdictions and still continues so to be.

In *Commonwealth v. Campbell,* 89 Mass. (7 Allen) 541, on an indictment for murder for a homicide committed near an armory in Boston during a riot which grew out of the enforcement of the Civil War draft, the Commonwealth's evidence showed that the defendant was participating in the riot; that a military force was called out to suppress the riot and was stationed in the armory; and that the mob was fired on by the soldiers and the soldiers were fired on by the mob. The case was tried before Chief Justice BIGELOW and Justices METCALF, MERRICK and HOAR of the Supreme Judicial Court of Massachusetts and was prosecuted by the Attorney General of the State in person. The Attorney General requested the court to instruct the jury as follows: "That whether [the deceased] was killed by a shot from within or without the armory, all the parties unlawfully engaged in the transactions which resulted in the homicide were at common law guilty, at least of manslaughter." The instruction was refused in an opinion for the court by Chief Justice BIGELOW who said in part (pp. 544-545), "No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his act in either sense unless committed by his own hand or by some one acting in concert with

him or in furtherance of a common object or purpose. Certainly that cannot be said to be an act of a party in any just sense, or on any sound legal principle, which is not only not done by him, or by any one with whom he is associated or connected in a common enterprise, or in attempting to accomplish the same end, but is committed by a person who is his direct and immediate adversary, and who is, at the moment when the alleged criminal act is done, actually engaged in opposing and resisting him and his confederates and abettors in the accomplishment of the unlawful object for which they are united. Suppose, for example, a burglar attempts to break into a dwelling-house, and the owner or occupant, while striving to resist and prevent the unlawful entrance, by misadventure kills his own servant. Can the burglar in such case be deemed guilty of criminal homicide? Certainly not." Coming to the facts of the particular case, Chief Justice BIGELOW said (pp. 547-548) that, "If the homicide was the result of a shot fired by the soldiers or other persons in the armory, acting together in defence against the riotous assembly, the defendant cannot be held guilty of either murder or manslaughter. The jury will accordingly be instructed that, unless they are satisfied beyond a reasonable doubt that the deceased was killed by means of a gun or other deadly weapon in the hands of the prisoner, or of one of the rioters with whom he was associated and acting, he is entitled to an acquittal."

In *Butler v. People,* 125 Ill. 641, 18 N.E. 338, William and Franklin Butler, with two other persons, were charged with murder for the killing of an innocent bystander by a shot fired by the town marshal in his effort to suppress the rowdy conduct of the Butlers and their companions. Citing *Commonwealth v. Campbell,* supra, as a case in point, Chief Justice CRAIG,

speaking for the Supreme Court of Illinois, said that ". . . we know of no well-settled rule of law which would hold the defendants liable for the acts of [the town marshal]. They would be responsible for what they did themselves, and such consequences as might naturally flow from their acts and conduct; but they never advised, encouraged, or assented to the acts of [the town marshal], nor did they combine with him to do any unlawful act, nor did they in any manner assent to anything he did, and hence they could not be responsible for his conduct toward the deceased." The rowdyism of the Butlers and their companions was a misdemeanor and not a felony. But, the principle involved is the same so far as the defendants' criminal responsibility for the marshal's unintentional killing of an innocent third person was concerned. At common law, a homicide committed by one acting in furtherance of a misdemeanor (at least one *malum in se*) is, by like token, voluntary manslaughter (see 1 Warren, Homicide, §74), malice not being imputed since the initial offense was not a felony. And so, the jury convicted the Butlers of voluntary manslaughter. But, the Supreme Court of Illinois reversed the judgments for the reasons above quoted, viz., that criminal responsibility is not imputable to a wrongdoer for the homicidal effect of a resisting officer's accidental or unintentional killing of an innocent bystander.

In *Commonwealth v. Moore*, 121 Ky. 97, 88 S.W. 1085, the defendants, Moore and Kelly, assaulted *John* Young with the intent to rob him. Young drew a gun with which to defend himself, discharged it and accidentally killed *Anderson* Young, an innocent bystander. The indictment for murder was dismissed by the trial court and the Commonwealth appealed. The Kentucky Court of Appeals cited approvingly the cases of *Commonwealth v. Campbell* and *Butler v. People*, su-

pra, quoting from what it termed the "learned opinion of the Supreme Court of Massachusetts" in the *Campbell* case, and affirmed the dismissal of the indictment, saying in support of its action, "Here the homicide was not committed by the conspirators, either in the pursuance of the conspiracy or at all; but it was the result of action on the part of John Young, the proprietor of the house, in opposition of the conspiracy, and entirely contrary to the wishes and hopes of the conspirators. In order that one may be guilty of homicide, the act must be done by him actually or constructively, and that cannot be, unless the crime be committed by his own hand, or by the hands of some one acting in concert with him, or in furtherance of a common object or purpose. The defendants can in no sense be said to have aided or abetted John Young, for he was firing at them; and to hold them responsible criminally for the accidental death of a bystander, growing out of his bad aim, would be carrying the rule of criminal responsibility for the acts of others beyond all reason. Suppose, instead of killing an innocent bystander, Young [the proprietor of the house] had killed Moore, one of the robbers, would the [surviving robber] have been guilty of murder?" This query posed the very question present in the instant case, but the Kentucky Court of Appeals rhetorically answered it in the negative as follows: "And yet, if the principle sought to be maintained by the Commonwealth be sound, the survivor would necessarily be guilty of murder, because the owner of the house to be robbed had killed his companion, for he could just as truly be said to have aided and abetted the owner of the house in that case as in this."

In *State v. Oxendine*, 187 N. C. 658, 122 S.E. 568, a bystander was accidentally shot and killed by a man defending himself against an attack by the defendants

who were indicted and tried for murder for the killing. A general verdict of guilty of manslaughter was returned as to all defendants. On appeal by one of them (Oxendine), the Supreme Court of North Carolina, in reliance upon the *Campbell, Butler* and *Moore* cases, supra, reversed the conviction on the ground that "Walter Oxendine [the appellant] and Proctor Locklear [the man who fired the fatal shot] were not acting in concert; they were adversaries; and it is the general rule of law that a person may not be held criminally responsible for a killing unless the homicide were either actually or constructively committed by him; and, in order to be his act, it must be committed by his own hand, or by someone acting in concert with him, or in furtherance of a common design or purpose."

In *People v. Udwin,* 254 N. Y. 255, 172 N.E. 489, some escaped convicts were indicted for the murder of one of their number who was shot and killed in attempting to escape. In New York, escape from prison is a felony and any killing committed during the perpetration of a felony is first degree murder. Evidence as to who fired the fatal shot was circumstantial. The defendants were convicted of murder in the first degree. On appeal, the defendant, Udwin, contended that the evidence did not exclude all reasonable possibilities that the fatal shot was fired by someone other than one of the conspirators. The Court of Appeals approved what it termed "the law of the case as stated by the trial justice" who had charged that it was the burden of the prosecution to establish "beyond a reasonable doubt that the shot which killed [the deceased] was fired by one of the convicts engaged with the defendants, or some of them, in a common purpose or design to unlawfully and feloniously escape." The defendants were convicted; and, the question on the appeal was whether the evidence was sufficient to justify

the verdict. By a process of elimination, the Court of Appeals found *conclusively* from the evidence that the shot which killed the deceased could have been fired *only* by one of the escaping convicts. It is implicit in the opinion that a *possible* contrary finding would have required a reversal of the convictions.

In *People v. Garippo,* 292 Ill. 293, 127 N.E. 75, surviving robbers were charged with the murder of an accomplice who had met his death, during the course of the robbery, at the hands of a person unknown. In that case, one Scalzitti, along with the defendants, had engaged in a highway robbery. During the progress of the robbery, Scalzitti, the leader, was shot and killed. The trial judge submitted the case to the jury on the basis that, a death having occurred in the course of the robbery, all of the robbers were alike guilty of the homicide. The defendants were found guilty of manslaughter. On the defendants' appeals, the Supreme Court of Illinois, after discussing and quoting with approval from the *Campbell, Butler* and *Moore* cases, supra, reversed the convictions, holding that "Under the reasoning of the above authorities, instructions 16 and 19 given on behalf of the State and complained of by counsel for plaintiffs in error must be held erroneous. Under those instructions, plaintiffs in error might be held responsible for shooting done by another person when there was no concert of action between him and them."

The rule long recognized and sedulously applied by the courts of this country, of which the *Campbell, Butler* and *Moore,* cases, supra, are notable examples, is aptly stated in 13 Ruling Case Law at pp. 753-754 as follows: "Thus, where persons conspire together to commit robbery, and while carrying out such conspiracy their victim, in self-defense, discharges a fire arm at his assailants, and accidentally kills a bystander,

the conspirators are not guilty of the homicide." To say, as has been suggested, that the cases above cited and discussed are the only decisions so holding affords only an unwarranted and specious implication. There has not been cited to us, nor has our research disclosed, a decision in any State of the Union, or in England, that holds to opposite effect except for this court's decisions in *Commonwealth v. Almeida* and *Commonwealth v. Thomas*.

There was testimony in the *Almeida* case that the lethal bullet was fired by one of the robbers. This was disputed by the defendant who claimed that it was from a policeman's revolver. It was in that situation that the court charged the jury that, the defendant having been engaged in a robbery at the time of the killing, it was immaterial to a conviction of first degree murder that the fatal bullet was fired by someone other than the defendant or an accomplice. As authority for this instruction, the trial judge relied upon a dictum in *Commonwealth v. Moyer and Byron*, 357 Pa. 181, 53 A. 2d 736. The jury convicted Almeida of first degree murder. In affirming the judgment of sentence, this court declared that an accidental or unintentional killing occurring during the perpetration of a robbery rendered those feloniously engaged in the robbery guilty of murder in the first degree even though the fatal wound was not inflicted by any of the felons or some one acting in their behalf. The rationale of this pronouncement lay in an adaptation of the doctrine of proximate cause (as known to the law of torts) to the common-law requirement of felony-causation as a prerequisite to the applicability of the felony-murder rule. Thus, this court's opinion specifically avowed that "Our decision in the *Moyer-Byron* case was an application of the long established principle that he whose felonious act is the *proximate* cause

of another's death is *criminally* responsible for that death and must answer to society for it exactly as he who is *negligently* the *proximate cause* of another's death is *civilly* responsible for that death and must answer in damages for it." As we have already seen, the "causation" requirement for responsibility in a felony-murder is that the homicide stem from the commission of the felony. Obviously, the assumed analogy between that concept and the tort-liability requirement of proximate cause is not conclusive. If it were, then the doctrine of supervening cause, which, for centuries, courts have recognized and rendered operative on questions of proximate cause, would have to be considered and passed upon by the jury. But, that qualification, the *Almeida* case entirely disregarded.

Beyond that, the statement in the opinion for the court in the *Almeida* case that "Our decision in Commonwealth v. Moyer and Byron, supra, is authority for our decision in this case" was without justification. The expression in the *Moyer and Byron* opinion to which the *Almeida* opinion thus alluded was that "A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons." That statement was a palpable gratuity as an examination of the trial record in the *Moyer and Byron,* case will at once disclose.

In its general charge, the court submitted the *Moyer and Byron* case on the basis that, in order to convict, the jury would have to find, beyond a reasonable doubt, that either one or the other of the defendants fired the bullet which killed the innocent gasoline station attendant whose death was the subject-matter of the indictment. And, in addition, the court

affirmed without qualification the defendants' second, point for charge as follows: "The defendant is entitled to an acquittal unless the commonwealth has produced evidence of such a quality as to prove beyond a reasonable doubt that the bullet causing the death of the deceased was fired from the gun of either of the defendants." Furthermore, at the conclusion of the charge and after reading to the jury the above-mentioned point as affirmed, the trial judge, at the insistence of counsel for the defendants, repeated to the jury verbatim this same requested instruction. Naturally, neither Moyer nor Byron charged the trial judge with any error in regard to his instructions on the law concerning what was necessary for the jury to find, relative to who fired the fatal shot, before the defendants could be convicted of murder. Nor did the district attorney at any time argue or even intimate that the trial judge had charged the jury more favorably to the defendants than he should have. The indisputable fact is that the contention that it was *immaterial* who fired the fatal shot was never raised in the court below in the *Moyer and Byron* case. Consequently, the point required no discussion by this court. What was said in the *Moyer and Byron* opinion in such connection was, therefore, no more than an expression of the opinion writer's individual view concerning a matter *coram non judice*. In the light of the trial court's charge, the jury's verdict in that case cannot be taken to mean otherwise than that the fatal bullet was fired by one of the felons in furtherance of their criminal conspiracy.

It follows that the decision in the *Moyer and Byron* case was in no sense authority for the ruling in *Almeida*. And, the same can be said for the decisions in *Commonwealth v. Guida, Commonwealth v. Doris* and *Commonwealth v. Sterling,* cit. supra. In each of those

cases the death-dealing act was committed by one participating in the initial felony. The cases of *Commonwealth v. Phillips,* 372 Pa. 223, 93 A. 2d 455, and *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733, which have lately been advanced as having reaffirmed the ruling in *Almeida,* are not presently germane. Neither of those cases was in any way related to or dependent upon the decision in the *Almeida* case. In the *Phillips* case, the defendant pleaded guilty to a charge of murder, actually admitting that he himself had fired the fatal bullet, while in the *Lowry* case the evidence supported a finding by the jury that the defendant was the co-conspirator of the felon who fired the fatal shot. Neither of these cases involved the rationale of the *Almeida* case.

The out-of-State cases cited and relied on in the *Almeida* opinion were equally not in point. For example, in the so-called "shield" cases, where a felon uses the interposition of the body of an innocent person to escape harm in flight from the scene of his crime, the malice is *express.* See, e.g., *Keaton v. State,* 41 Tex. Cr. R. 621, 57 S.W. 1125; *Taylor v. State,* 41 Tex. Cr. R. 564, 55 S.W. 961; and *Wilson v. State,* 68 S.W. 2d 100 (Ark.). In not one of those cases was the malice imputed by the defendant's participation in the initial felony. Obviously, they were not based on the felony-murder theory. Indeed, the courts which decided those cases expressly recognized the validity of the principles enunciated in the *Campbell, Butler* and *Moore* cases, supra, but found such principles not pertinent because the factual situations then before them (viz., the use of an innocent person as a shield or breastwork against the hostile bullets of an adversary) supported findings of *express* malice. And, that was so regardless of whether the felons' motive in placing an innocent victim in a position of mortal

danger was to protect themselves from shots fired at them or to induce their adversaries not to shoot at all. The malice would be no less than express in either event.

Nor did *Commonwealth v. Bolish,* supra, justify the decision in the *Thomas* case. Bolish was indicted for murder of his confederate, Flynn, who died from severe burns received while committing arson with the use of an inflammable liquid and an electric hot plate furnished by Bolish for use in setting the fire of the criminal undertaking. Under the evidence, Flynn was either (1) an accomplice of Bolish who allegedly had planned the arson or (2) he was Bolish's weak-minded tool who acted under the impulse of Bolish's influence and domination. Thus, the malice essential to charging Bolish with murder was present either (1) *by imputation* under the felony-murder theory, if the death was found by the jury to have occurred as a result of confederate Flynn's act in furtherance of the criminal conspiracy or (2) *expressly,* if Flynn was found to be merely a pliant dupe who acted on Bolish's order in performing the criminal act with highly dangerous means which threatened grievous bodily harm to the actor.

The instant appeal affords an appropriate occasion for the repudiation of *Commonwealth v. Thomas,* supra, which we now expressly overrule as an unwarranted judicial extension of the felony-murder rule. Fortunately, no one has suffered any penalty as a result of the holding in that case. Following our remand of the record in the *Thomas* case, the district attorney moved the trial court for leave to *nol pros* the murder indictment. The court approved the motion, and a *nolle prosequi* was duly entered. At the same time, the court accepted the defendant's plea of guilty to an indictment charging him with armed rob-

bery of which he was unquestionably guilty and for which he was immediately sentenced and committed to the penitentiary where he is now serving his sentence. Since we herewith overrule *Commonwealth v. Thomas,* it follows that the present appellant's conviction of murder cannot be sustained on the basis of the decision in that case.

The Commonwealth contends, however, that, entirely apart from the *Thomas* case, the appellant's conviction of murder can be upheld on the rationale of *Commonwealth v. Almeida.* As already indicated, *Almeida* was, itself an extension of the felony-murder doctrine by judicial decision and is not to be extended in its application beyond facts such as those to which it was applied. In short, the *Almeida* case was concerned with the killing, during the perpetration of a felony, of an innocent and law-abiding person by someone other than the felons or ones acting in aid of their criminal conspiracy. The evidence warranted a finding that it was an accidental killing by an officer of the law, but the felons were held accountable nonetheless on the basis of proximate causation regardless of who fired the fatal shot. In the present instance, the victim of the homicide was one of the robbers who, while resisting apprehension in his effort to escape, was shot and killed by a policeman in the performance of his duty. Thus, the homicide was justifiable and, obviously, could not be availed of, on any rational legal theory, to support a charge of murder. How can anyone, no matter how much of an outlaw he may be, have a criminal charge lodged against him for the consequences of the lawful conduct of another person? The mere statement of the question carries with it its own answer.

It is, of course, true that the distinction thus drawn between *Almeida* and the instant case on the basis of

the difference in the character of the victims of the homicide is more incidental than legally significant so far as relevancy to the felony-murder rule is concerned: cf. Morris, *op. cit. supra*, at p. 56. In other words, if a felon can be held for murder for a killing occurring during the course of a felony, even though the death was not inflicted by one of the felons but by someone acting in hostility to them, it should make no difference to the crime of murder who the victim of the homicide happened to be. However, the factual difference, so noted, admits of a recognizable distinction with respect to a felon's responsibility for an incidental killing (which another has committed), depending upon whether the homicide was justifiable or excusable, and such distinction serves the useful purpose of thwarting further extension of the rule enunciated in *Commonwealth v. Almeida* that it is immaterial who fires the fatal shot so long as the accused was engaged in a felony.

The limitation which we thus place on the decision in the *Almeida* case renders unnecessary any present reconsideration of the extended holding in that case. It will be time enough for action in such regard if and when a conviction for murder based on facts similar to those presented by the *Almeida* case (both as to the performer of the lethal act and the status of its victim) should again come before this court.

Judgment of sentence reversed and record remanded with directions that the defendant's motion in arrest of judgment be reinstated and thereupon granted.

-----

CONCURRING OPINION BY MR. JUSTICE COHEN:

I concur in the reasoning and result of the majority opinion in reversing the judgment of conviction in

*Commonwealth v. Redline* and in overruling the principle established in *Commonwealth v. Thomas,* 382 Pa. 639, 117 A. 2d 204 (1955). However, I believe the majority did not go far enough. I would also overrule our decisions in *Commonwealth v. Almeida,* 362 Pa. 596, 68 A. 2d 595 (1949) and *Commonwealth v. Bolish,* 381 Pa. 500, 113 A. 2d 464 (1955).

To me a conviction of murder in the first degree upon the theory of felony-murder depends upon the combination of the following elements—*all* of which are essential.

1. There must be a homicide.

2. The homicide must have been committed by an act of the defendant or, by applying the "co-conspirator's rule", by one acting in concert with him in the furtherance of the criminal conspiracy.

3. The criminal undertaking during which the death resulted must have been a felony (a common law felony).

In such circumstances the felony-murder rule operates to supply the element of malice aforethought to the homicide so as to make the homicide murder. Where the murder was committed in the course of the felony of arson, rape, burglary, robbery, or kidnapping, the Pennsylvania *"degree of murder"* statute applies to make the murder one of first degree. All other felony-murder not perpetrated in the course of the above enumerated felonies is murder in the second degree. (Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701.)

When *Almeida* is weighed against the above requirements it is apparent that the decision cannot stand because the homicide therein was not committed "by an act of the defendant or, by applying the co-conspirator's rule, by one acting in concert with him in furtherance of the conspiracy."

When *Bolish* is likewise weighed against these requirements, it also is apparent that the decision of this Court cannot stand because in that case no *homicide* was committed.

In *Almeida* the defendant in attempting to escape from the scene of his robbery provoked a gun battle with police in which a third party was shot and killed by one of the pursuing officers. The policemen's act of shooting was excusable. That excusable shooting, however, cannot confer liability upon Almeida for the death of a third party. *"The killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking."* (Majority opinion page 496). "In adjudging a felony-murder, it is to be remembered at all times that the thing which is imputed to a felon for a killing incidental to his felony is *malice* and *not the act of killing.*" (Majority opinion page 495) (emphasis in the original). Since Almeida himself did not commit the homicide, nor did anyone acting in concert with him so do, it follows that Almeida should not have been convicted of murder. (See the numerous cases cited in Majority opinion pages 486-510).

In the *Bolish* case, a conspirator, Flynn, accidentally killed himself in the perpetration of an arson while his co-conspirator, the defendant, remained without. Bolish also should not have been convicted of murder because *no homicide was committed.* "Homicide does *not* include intentional or accidental self-destruction." I Warren, Homicide 164 (Permanent ed. 1938) (emphasis supplied). Homicide *is* "the killing of one human by *another.*" (See cases cited in Majority opinion pages 492, 493, 498). Thus, the Commonwealth failed to establish the first requirement for a conviction of felony-murder; there being no homicide, there was no murder.

Flynn was not guilty of any crime for accidentally killing himself. Bolish, therefore, although equally liable for all acts of his co-conspirator in furtherance of the conspiracy, cannot be held criminally responsible for an act of his co-felon *if the act does not bring liability upon the co-conspirator himself.*

In the only other reported opinion in which this issue was presented to an appellate court for determination, *People v. Ferlin,* 203 Cal. 587, 265 Pac. 230 (1928), the California Supreme Court held, on facts substantially similar to those of the *Bolish* case, that the accused must be *acquitted of murder.* And in *People v. LaBarbera,* 287 N. Y. Supp. 257 (Sup. Ct. 1936), again on facts akin to those of the *Bolish* case, it was held that under the New York Penal Law the accused was not guilty of murder because there was *no killing of one person by another.*

I might be compelled to a different conclusion in the *Bolish* case if, as the majority opinion suggests, the evidence pointed inescapably to a finding that Flynn was a compliant dupe in Bolish's hands and was knowingly sent by Bolish into a situation likely to cause his death.[1] However, the evidence does not justify such a conclusion, nor was this hypothesis clearly explained and submitted to the jury as the sole basis for a conviction of murder under the evidence presented in the *Bolish* case.

From the standpoint of public policy what purpose is served by the result reached by the majority in the *Bolish* case? ". . . [T]he deterrent effect of such a result is very doubtful; the increased punishment strikes at the wrong thing—not at the harm intended,

---

[1] One "commits" a homicide if he deliberately places another in a position of deadly peril from an independent force or agency and death thereby results.

but at the slight chance of an unintended greater harm; and emotions of vengeance are an insufficient justification for the fictional attribution of the *mens rea* of murder [and certainly the act of killing itself] to one whose desire was quite certainly not a desire to kill." Morris, The Felon's Responsibility for the Lethal Acts of Others, 105 U. of Pa. L. Rev. 50, 80 (1956).

If, as the majority point out, new criminal liabilities should be imposed by the legislature rather than formulated by the court, then the decisions in both *Bolish* and *Almeida* should not be allowed to stand. Until the decisions in these two cases no defendant had ever been held guilty of murder for either the accidental self-killing of a fellow-conspirator or for the excusable killing of an innocent party by an officer of the law even though both deaths occurred while felonies were in progress. That being so, the liability of the defendants for murder in *Bolish* and *Almeida* can only be the result of a piece of judicial *ex post facto* law-making. Criminal acts which did not warrant convictions of murder at the time of their commission should not later be held by this Court to constitute murder.

I would overrule *Commonwealth v. Almeida* and *Commonwealth v. Bolish*.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

The brutal crime wave which is sweeping and appalling our Country can be halted only if the Courts stop coddling, and stop freeing murderers, communists and criminals on technicalities made of straw. The Courts seem to have forgotten that Justice is not a one-way street—law-abiding citizens and law-abiding communities are entitled, at least equally with criminals, to the protection of the law.

The felony murder doctrine was clearly and well established in Pennsylvania by legal principles which are several hundred years old and in particular by 5 decisions of the Supreme Court of Pennsylvania handed down in the last ten years which are directly in point and sustain, without the slightest doubt, the conviction of this murderer (Redline). Faith in Justice, and confidence and trust in our Courts are seriously impaired when these recent and notable decisions of this Court, as well as long established principles of law are repudiated and overruled or discarded—not for the protection of society or for any other worthy objective, but to give further protection to individuals who are defying our laws, destroying the peace and jeopardizing the welfare of our communities.

Redline and Worseck held up at gun-point persons in the Midway Restaurant in Reading. They disarmed and held captive two police officers. They then fled, compelling a man named Herschman to accompany them, obviously intending to use him as a shield. Some officers saw them, whereupon Redline aimed a 45-caliber revolver at a policeman who was 15 to 20 feet away, and fired point-blank but failed to hit his intended victim. Redline was the first one to shoot. The policeman returned the fire and in the ensuing gun battle two policemen, Redline and Worseck were injured, the policemen seriously. Worseck died from the wound inflicted by a bullet from a policeman's gun. The majority can free Redline only by performing a colossal surgical operation on the felony murder law of Pennsylvania—with disastrous damage to the public.

In Order to Free Redline of Murder

(1) the present majority has to *expressly* overrule the very important and controlling recent felony murder decisions of this Court namely *Commonwealth v.*

*Almeida,* 362 Pa. 596, 68 A. 2d 595 (1949), the leading modern case on the subject of felony murder which has since been affirmed and quoted with approval by this Court in 4 recent decisions, *Commonwealth v. Moyer and Byron,* 357 Pa. 181, 53 A. 2d 736, *Commonwealth v. Bolish,* 381 Pa. 500, 113 A. 2d 464, and *Commonwealth v. Thomas,* 382 Pa. 639, 645, 117 A. 2d 204 (handed down only two years ago) which the majority admit unquestionably sustains Redline's conviction;*

(2) the present majority has to repudiate all the basic reasons and fundamental principles upon which this Court's prior felony murder decisions were predicated in *Commonwealth v. Moyer and Byron,* 357 Pa. (1947), in *Commonwealth v. Almeida,* 362 Pa. (1949), in *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733 (1953), in *Commonwealth v. Bolish,* 381 Pa. (1955) and in *Commonwealth v. Thomas,* 382 Pa. (1955) ;

(3) the present majority has to adopt the contentions and theories which have been repeatedly and strenuously argued by convicted murderers for ten years, but which, after very careful consideration, were utterly and completely refuted and rejected by this Court in five carefully considered and comprehensive opinions.

Because of these facts it is necessary to carefully and thoroughly analyze and review the principles of felony murder, its origin and development, and most important of all, *the recent Pennsylvania cases inter-*

---

* *Commonwealth v. Almeida,* 362 Pa., supra, *Commonwealth v. Bolish,* 381 Pa., supra, and *Commonwealth v. Thomas,* 382 Pa., supra, would have to be overruled according to the concurring opinion of Justice COHEN in *Commonwealth v. Redline;* and *Commonwealth v. Bolish* and *Commonwealth v. Thomas* would have to be overruled according to Justice MUSMANNO's dissenting opinion in *Commonwealth v. Bolish,* 391 Pa. 550, 138 A. 2d 447.

*preting it,* in order to demonstrate the fallaciousness and untenability of the majority opinion.

The majority opinion specifically decides that when two robbers attempt to kill a policeman and in the ensuing gun-play one of the robbers is killed by the policeman, the other robber cannot be convicted of murder because it was a justifiable killing, i.e., it is justifiable to kill a robber. Let us examine how the majority opinion reaches that conclusion.

Common Law Murder According To Blackstone

The majority opinion goes back to and bases its conclusion on Blackstone's Commentaries, circa 1765. Blackstone, quoting from Sir Edward Coke, Lord Chief Justice of England, thus defines murder: " 'When a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and under the king's peace, with malice aforethought, either express or implied' ": IV Blackstone's Commentaries, §195, page 1591. We agree with the majority that "malice, express or implied" is the "hall-mark" of murder both in Blackstone's day and today: IV Blackstone's Commentaries, §198, page 1596; *Commonwealth v. Bolish,* 381 Pa., supra; *Commonwealth v. Almeida,* 362 Pa., supra; *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A. 2d 125; *Commonwealth v. Thomas,* 382 Pa., supra; *Commonwealth v. Malone,* 354 Pa. 180, 47 A. 2d 445; *Commonwealth v. Drum,* 58 Pa. 9.

We note, parenthetically, that the law of Pennsylvania dealing with murder, including felony murder, has naturally advanced beyond that in Blackstone's day in order to keep pace with modern conditions of society. However, even Blackstone furnishes no authority for the majority's opinion or conclusion. For example, Blackstone says that an accidental or unintentional homicide is an excusable homicide (§182, page

518

1580 et seq.). But Blackstone then gives examples which demonstrate—and the majority opinion admits—that this statement or proposition of law did not mean then, and certainly does not mean today, that *all* accidental or unintentional, homicides are excusable. An excusable, i.e. an accidental or unintentional homicide was interpreted, even in Blackstone's day and many times since then in Pennsylvania,* not to mean or include an accidental or unintentional death *which arises out of or results from a homicide committed during a felony.* For example, Blackstone says: ". . . if one intends to do another felony, and *undesignedly* kills a man, this is also murder": IV Blackstone's Commentaries, §§200-201, page 1599. He then gives the classic illustration which has become hornbook law to every student, lawyer and Judge: "Thus, if one shoots at A. and misses him, but kills B., this is murder, [even though the killing of B. was unintentional and accidental] because of the previous felonious intent, which the law transfers from one to the other." In other words, as Blackstone points out, if A intends to shoot B but misses him and unintentionally kills a stranger, or if A, intending to commit any one of the crimes which were felonies at common law,** accidentally and unintentionally kills a man, he is guilty of murder. This type of felonious homicide became known as felony murder, and as the majority opinion admits, was firmly imbedded in the common law even before Blackstone's day.

---

* See cases infra.

** *Commonwealth v. Bolish*, 381 Pa. 500, 113 A. 2d 464, the Court in a footnote said: "At common law there were 8 or 9 felonies, namely, murder, manslaughter, rape, sodomy, robbery, larceny, arson, burglary, and perhaps mayhem: Clark & Marshall, Crimes §3 (4th ed. 1940); 1 Wharton, Criminal Law §26 (12th ed. 1932)."

The reason for the felony murder doctrine or principle in Blackstone's day *as well as today,* is obvious —it was established as *a wise and absolutely necessary rule for the protection of society.*

The majority opinion admits, as it must, that under the decisions of the Supreme Court of Pennsylvania—unless they are overruled—(1) Redline was properly convicted of murder and (2) the killing of the co-robber by a policeman was a justifiable killing qua the policeman, but not qua the robber who set in motion the felonious forces which he knew would likely cause death to his co-felon or to a policeman or the proposed victim or an innocent bystander. The majority, attempting to escape these inescapable facts, bases its opinion upon the syllogism: Blackstone holds that no one can be convicted for a justifiable killing and since it is justifiable for a policeman to kill a robber during the perpetration of a robbery, no one can be convicted of murder for killing one of the robbers. While it is immaterial what Blackstone said, in view of the Pennsylvania cases interpreting felony murder, the majority's theory or conclusion is not supported even by Blackstone.

Blackstone says, §177, page 1577: "Now, homicide, or the killing of any human creature, is of three kinds: justifiable, excusable, and felonious. The first has no share of guilt at all; the second very little; but the third is the highest crime against the law of nature that man is capable of committing." Blackstone then gives examples of (a) justifiable homicides, and (b) murders; some of the killings which were considered murder in Blackstone's day would be considered justifiable or excusable today.

The first and probably most important example of justifiable homicide given by Blackstone is the case of an executioner who validly executes a convicted crimi-

nal who is condemned to die. He then points out that to *wantonly* kill a felon or a traitor is murder. In other words, killing a felon or a convicted murderer may be justifiable if committed by X and murder if committed by Y. Furthermore, Blackstone nowhere says that if A and B agree to rob C, A could not be guilty of the murder of B if B was intentionally or unintentionally shot by a policeman during the robbery.

Moreover, the law is not static—it is progressive; its essence, its strength, its growth, and its efficiency lie in the indisputable fact that both in the civil law and in the criminal law the principles, and *particularly the basic principles* enunciated and established by the Courts are continuously applied to new or different factual situations. If that were not so, the domain of the law would be as large and extensive as the principality of Monaco, and the law would progress like a turtle. Countless examples of this axiom or self-evident truth are familiar or will quickly occur to everyone.

### Murder In Pennsylvania Is Common Law Murder As Modified By The Legislature And As Interpreted And Applied By The Supreme Court of Pennsylvania

Murder in Pennsylvania was originally common law murder* as it existed at common law in England and subsequently in colonial times and in the early days of the Commonwealth. But murder in Pennsylvania is no longer solely common law murder as it existed in colonial times and subsequently in the early days of this Commonwealth. First, our courts have interpreted murder in the light of modern conditions; and

---

* Cf. *Commonwealth v. Drum*, 58 Pa. 9; *Commonwealth v. Bolish*, 381 Pa., supra.; *Commonwealth v. Thomas*, 382 Pa., supra.

second, in addition to the statutory train-wrecking crime of murder,* the Legislature (1) has made death resulting accidentally, unintentionally or otherwise from the common law *misdemeanor* of kidnapping, murder in the first degree, and (2) has made a killing, accidental, unintentional or otherwise, in the perpetration of *statutory* arson, *statutory* rape, and *statutory* burglary, murder in the first degree: *Commonwealth v. Bolish,* 381 Pa., supra; *Commonwealth v. Maloney,* 365 Pa. 1, 73 A. 2d 707; *Commonwealth v. Gossard,* 383 Pa. 239, 117 A. 2d 902.

Nevertheless, it remains true that our theory and our definition of murder was initially derived from and even today is based, with the above statutory exceptions, upon the common law *as interpreted and applied to modern conditions by the decisions of the Supreme Court of Pennsylvania.* These recent decisions of the Supreme Court of Pennsylvania are the key to the felony murder door—*the key which the majority have forgotten or lost.*

---

\* Section 919 of The Penal Code of 1939, P. L. 872, 18 PS §4919; *Commonwealth v. Johnson,* 368 Pa. 139, 81 A. 2d 569. The majority opinion commences its review of relevant authorities by stating: "The only constitutional power competent to define crimes. . . . is the legislature, and courts do well to leave the promulgation of police regulations to the people's chosen legislative representatives . . . . The definition of murder at English common law . . . alone defines the crime in this State. . . . except for one special and presently irrelevant mode of death-dealing by means of intentional train-wrecking, there is no statutory crime of murder in Pennsylvania." Although not presently important, it seems to me that these statements are inconsistent, and that neither of them is accurate. It is true that murder has never been *expressly* defined by statute in Pennsylvania and it has been sometimes said that it is "common law murder". But the latter statement is not accurate. Cf. *Commonwealth v. Bolish,* 381 Pa. 500, 509, 510, 113 A. 2d 464.

"Murder is defined as an unlawful killing of another with malice aforethought, expressed or implied: Commonwealth v. Buzard, 365 Pa. 511, 515, 76 A. 2d 394": *Commonwealth v. Bolish,* 381 Pa., supra. How have the Courts of Pennsylvania interpreted the words "implied malice", and in particular, how have they applied the principles of felony murder to the complex situations of our modern life? This Court has applied the felony murder doctrine *and its basic principles* in five* cases in the last ten years in which the murder occurred in the perpetration of one of the statutory felonies. Each of the recent felony murder cases after 1949 reaffirmed the decision of this Court in the leading case of *Commonwealth v. Almeida,* 362 Pa. (1949) *and reiterated,* usually at great length, *the basic principles upon which that decision was so clearly and convincingly predicated.*

We shall analyze and review the recent felony murder decisions of this Court and the rationale and the fundamental principles upon which they were based.

### Recent Pennsylvania Cases Dealing With Felony Murder

In *Commonwealth v. Moyer and Byron,* 357 Pa. 181, 53 A. 2d 736 (1947), defendants' conviction of murder was sustained by this Court which specifically held that if an innocent bystander was killed during a robbery it made no legal difference whether the bystander was killed by one of the felons or by one of the proposed victims. That case *directly rules* the *Redline* case and sustains his conviction of murder. The Court said (page 188 et seq.): "The second assignment of error is based on the excerpt from the charge of the court in which the jury was instructed that: 'All of

---

* They were reiterated in another recent decision of this Court.

the participants in an attempted robbery are guilty of murder in the first degree if someone is killed in the course of the perpetration of the first-named crime. That is the law of the Commonwealth of Pennsylvania.' The appellants challenge that statement and say that the issue in this case is whether or not the decedent met his death by a wound inflicted by the defendant Moyer *or by the garage owner Shank.*

"This assignment of error poses the question whether or not these defendants can legally be convicted of murder if the bullet which killed Zerbe came from the revolver fired by the latter's employer in an attempt by him to frustrate the attempted robbery. We have no doubt that even under these facts, which facts the Commonwealth does not concede, the complained of conviction was proper.

"*A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggressions of the felon or felons. . . .*

"The doctrine that when malice is the mainspring of a criminal act the actor will be held responsible for any consequence of his act though it was not the one intended was recognized centuries ago when it was held that, quoting from Blackstone, Book IV, page 1599, section 201, 'if one shoots at A and misses him, but kills B, this is murder, because of the previous felonious intent, *which the law transfers from one to the other.*' (Italics supplied). *It is equally consistent with reason and sound public policy to hold that when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence*

*results from the initial criminal act.* For any individual forcibly to defend himself or his family or his property from criminal aggression is a primal human instinct. It is the right and duty of both individuals and nations to meet criminal aggression with effective countermeasures. Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance. Any robber or burglar who carries deadly weapons (as most of them do and as these robbers did) thereby reveals that he expects to meet and overcome forcible opposition. What this court said in Commonwealth v. LeGrand, 336 Pa. 511, 518, about burglars, applies equally to robbers: "Every burglar is a potential assassin and when his felonious purpose encounters human opposition his *intent to steal* becomes an *intent to kill* and any weapon he finds at hand becomes a weapon of murder." Every robber or burglar knows that a likely later act in the chain of events he inaugurates will be the use of deadly force against him on the part of the selected victim. *For whatever results follow from that natural and legal use of retaliating force, the felon must be held responsible.* For Earl Shank, the proprietor of a gas station in Ridley Township, Delaware County, which at 11 P.M. on July 13, 1946, was being attacked by armed robbers, to return the fire of these robbers with a pistol which he had at hand was as proper and as inevitable as it was for the American forces at Pearl Harbor on the morning of December 7, 1941, to return the fire of the Japanese invaders. The Japanese felonious invasion of the Hawaiian Islands on that date was in law and morals the proximate cause of all the resultant fatalities. The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality.

"*If in fact one of the bullets fired by Earl Shank in self-defense killed Harry Zerbe, the responsibility for that killing rests on Moyer and his co-conspirator Byron,* who had armed themselves with deadly weapons for the purpose of carrying out their plan to rob Shank and whose murderous attack made Shank's firing at them in self-defense essential to the protection of himself and his employees and his property. If, for example, a father sees his child being kidnapped and opens fire, as any normal father would be expected to do if he had a gun available, and if the bullet which he fires at the kidnapper inadvertently kills the child, the death of the child is properly attributable to the malicious act of the kidnapper.''

That case not only on its facts but by its reiteration and application of basic principles of law *directly governs and controls* the *Redline* case and compels us to affirm Redline's conviction of murder.

*Commonwealth v. Moyer and Byron* was followed and approved by *Commonwealth v. Almeida,* 362 Pa. 596, 68 A. 2d 595, which became known as the leading felony murder case in Pennsylvania. In that case, *which factually and legally directly rules the Redline* case and affirms his conviction of murder, Almeida was convicted of murder when a policeman was killed during a robbery by a bullet from the gun of another policeman. We believe that no case in the history of this Commonwealth was ever as carefully considered, debated and thoroughly discussed before the Opinion was approved by that distinguished Court as the *Almeida* case.* The Court, speaking through Chief Justice MAXEY in a learned comprehensive Opinion of 41 pages, said, inter alia: "The Commonwealth contends that the jury was justified in finding that the bullet

---

* Justice CHARLES ALVIN JONES was the lone dissenter.

which killed Ingling was fired by one of the three confederates and further that it is immaterial whether the bullet was fired by one of them or whether it was fired by one of the policemen in repelling the assault of the bandits and in attempting to frustrate their escape.

"The defendant's first assignment of error is that the court charged the jury as follows: '. . . *it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling* [a passerby who was the wife of the deceased] *it was murder.*' Defendant's second assignment of error is based on the court's refusal to affirm defendant's thirteenth point for charge, which reads as follows: 'If you find that the bullet which was fired and killed the deceased was not fired by any one of the three men charged with perpetrating the robbery in question, you cannot convict the defendant of murder in the first degree.' . . . 'I will charge the jury that it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling, it was still murder.'

"In his charge the trial judge said: 'If that [fatal] shot were fired by anyone, even anyone removed from these three participants, and that shot was fired in the perpetration of a robbery, members of the jury, that is murder; that is murder in the first degree. . . . *If one or more persons set in motion a chain of circumstances out of which death ensues, those persons must be held responsible for any death which by direct, by almost inevitable sequence, results from such unusual* criminal act. . . . So, if the death of Officer Ingling was the inevitable consequence of the unlawful act, or acts, of the defendant, or the continuation of the unlawful act, or acts, of the defendant, acting in concert—for every one who does an unlawful act is considered by the law as the doer of all that follows

—if that unlawful act be robbery, and if the result of that act is a killing, members of the jury, that killing is murder.'

"The defendant's thirteenth point for charge which the trial judge correctly rejected was in effect a request that the court instruct the jury that in order to convict the defendant of the death of Officer Ingling, the jury would have to find that the fatal shot was fired by one of the three robbers. *Such an instruction would have been in defiance of this Court's decision in* Commonwealth v. Moyer and Commonwealth v. Byron, 357 Pa. 181, 53 A. 2d 736, which decision the trial judge dutifully followed. In that decision handed down on June 30, 1947, this Court held in an opinion concurred in by the *six judges* who heard the argument on appeal, that: '*A man or men engaged in the commission of such a felony as robbery can be convicted of murder in the first degree if the bullet which causes death was fired not by the felon but by the intended victim in repelling the aggression of the felon or felons . . . when a felon's attempt to commit robbery or burglary sets in motion a chain of events which were or should have been within his contemplation when the motion was initiated, he should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act*\* . . .

---

\* We believe that Justice JONES' dissenting opinion in *Commonwealth v. Almeida* is diametrically opposed to his present opinion and specifically recognizes that a felon can be found guilty of the murder of his accomplice even if the fatal shot was not fired by one of the felons, provided, as he stated in *Almeida*, "it can be *factually* found that the conduct *of the defendant or his accomplices set in motion a chain of events among whose reasonsonably foreseeable consequences was a killing such as actually occurred.*" In order to determine the accuracy of our interpretation of Justice JONES' position in *Almeida*, we shall quote at length the pertinent parts of his dissenting opinion. He there said (page

Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance . . . If *in fact* one of the bullets fired by Earl Shank in self-defense killed Harvey Zerbe, the responsibility for that killing rests on Moyer and his co-conspirator Byron, who had armed themselves with deadly weapons for the purpose of carrying out their plan to rob Shank and whose murderous attack made Shank's firing at them in self-defense essential to the protection of himself and his employees and his property.' . . .

"The *factual* issue the defendant raises in this case is identical with the factual issue raised by the defendants in Commonwealth v. Moyer and Byron, supra; to wit, who fired the fatal bullet—one of the robbers or a man who was lawfully resisting the criminal attack of the robbers? The *legal* question presented and decided in the Moyer-Byron case was precisely the legal question raised in the instant case; to wit, when men who are feloniously shot at by robbers return their fire in self-defense and a third person is killed by a shot fired by the defenders, are the robbers whose felonious action caused the shooting guilty of murder? In the Moyer-Bryon case this Court after a thorough

---

643) : "Whether the acts of Almeida and his confederates were sufficient to constitute the proximate cause of the killing was a question of law but whether they did constitute the proximate cause was a question of fact for the jury. . . . The jury should have been instructed that, in order to find the defendant guilty of murder, it was not only necessary for them to find the killing to have been coincidental with the perpetration of a felony in which the defendant was at the time participating but that they would also have to find that the fatal shot was fired by one of the felons or, *if not fired by one of them, that the conduct of the defendant or his accomplices set in motion a chain of events among whose reasonable foreseeable consequences was a killing such as actually occurred.*"

discussion of that question decided that under the facts of that case, 'The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality.' (191 of 357 Pa.) *That was not dictum but authority.** 'Whenever a question fairly arises in the course of a trial, and there is a distinct decision thereon, the court's ruling in respect thereto can in no sense be regarded as mere "dictum".' New York Cent. & H.R.R. Co. v. Price, 159 F. 330, 332, 86 C.C.A. 502, 16 L.R.A., N.S., 1103. See also Schuetz's Estate, 315 Pa. 105, 172 A. 865. Our decision in Commonwealth v. Moyer and Byron, supra, is authority for our decision in this case.

*"Our decision in the Moyer-Byron case was an application of the long established** principle that he whose felonious act is the proximate cause of another's death is criminally responsible for that death and must answer to society for it** exactly as he who is negligently the proximate cause of another's death is civilly responsible for that death and must answer in damages for it . . . 'Though there is an active force intervening after defendant's act, the result will nevertheless be proximate if the defendant's act actively caused the intervening force.* In such a case the defendant's force is really continuing in active operation, *by means of the force it stimulated into activity. . .* Defendant

---

\* Although the question is academic and immaterial, the Justices who composed that Court (and since then Justice BELL in his concurring opinion in *Commonwealth v. Thomas*, 382 Pa. 639, 117 A. 2d 204) specifically held that this was not dictum; moreover, it was not a new but a long established principle of criminal law. Blackstone said, §197, page 1594: "If a man, however, does such an act of which the probable consequence may be, and eventually is, death; such killing may be murder, although no stroke be struck by himself and no killing be primarily intended . . ."

may by his conduct so affect a person or an animal as to stir him into action; the result of such action is chargeable to defendant . . .'

"Justice HOLMES in his book on 'The Common Law', (36th Ed.) pp. 56 and 57, said: Acts should be judged by *their tendency under the known circumstances,* not by the actual intent which accompanies them . . . 'The object of the law is to prevent human life being endangered or taken . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law . . . *the test of murder is the degree of danger to life attending the act under the known circumstances of the case.'*

"Courts in the United States, England and Canada have applied the foregoing principles of 'proximate cause' in murder cases, as the cases now to be cited and reviewed in this opinion demonstrate.

"The principle of proximate cause in *criminal* cases was applied by one of the ablest of Pennsylvania nisi prius judges 105 years ago, to wit, President Judge KING, in the case of Commonwealth v. Hare, 2 Pa. L. J. 467 (1844). Two *separate* bodies of men were fighting each other with firearms in a public street and as a result a citizen was killed. Judge KING held that the members of *both* bodies of men were guilty of felonious homicide. At the trial of Isaac Hare, one of the rioters, on a charge of murder, President Judge KING instructed the jury, inter alia, as follows: 'If during such a scene of unlawful violence an innocent third person is slain, . . . such a homicide would be murder at common law in all the parties engaged in the affray. It would be a homicide, the consequence of an unlawful act, and all participants in such an act are alike responsible for its consequences. *If the law should be called upon to detect the particular agents by whom such a slaying has been perpetrated in a general combat*

*of this kind, it would perpetually defeat justice and give immunity to guilt.* . . . Shall the violators of the public peace, whose unlawful acts have produced the death of the unoffending, escape, because from the manner and time of the fire it is impossible to tell from what quarter the implement of death was propelled? Certainly not. The law declares to such outlaws: you are *equally involved* in *all* the *consequences* of your assault on the public peace and safety. Is there any hardship in this principle? Does not a just regard to the general safety demand its strict application? . . . Joseph Rice was killed . . . at a time when the probabilities are that both belligerents were maintaining a desultory fire upon each other, and hence it becomes difficult to say with positive accuracy by which he was killed. Are the party *at the market* to escape the consequence of his death by raising a doubt *whether a shot* from their opponents at Jefferson Street, Harmony court and the Germantown road, may not have killed him?' After stating that 'each and all are criminally liable for all *the consequences flowing from* such acts of unauthorized vengeance', Judge KING said: 'Such we believe to be the law, founded on the plainest reason, justified by the clearest expediency, and demanded by the most obvious necessity.' (Italics supplied.) . . .

"Applying the aforegoing principles to the instant case, we have a band of robbers engaged in an exchange of shots with city policemen *whose duty it is to subdue the bandits if possible.* In the course of the exchange of deadly bullets Officer Ingling is slain. The policemen cannot be charged with any wrongdoing because their participation in the exchange of bullets with the bandits was *both in justifiable self-defense* and *in the performance of their duty.* The felonious acts of the robbers in firing shots at the policemen, well knowing

that their fire would be returned, as it should have been, was the proximate cause of Officer Ingling's death.

"The doctrine of proximate cause in criminal cases was applied by the Supreme Court of Tennessee in Letner v. State, 299 S.W. 1049 (1927). The facts were that three youths were crossing a river in a boat at a dangerous point. When the boat was about in the middle of the river someone standing above the western bank shot into the water about six feet from the boat. A second shot hit the water nearer the boat whereupon one of the youths jumped out causing the boat to capsize as a result of which the two other occupants were drowned. The man who fired the shot was indicted for murder. The defense contended that the death of the two youths was caused by the capsizing of the boat by the third occupant and that this act constituted a supervening cause. The Court held that the defendant could not avoid the consequences of his wrongful act by *relying on a supervening cause which resulted naturally and proximately* from that act. The Court said: '. . . in the instant case the wrongful act of the defendant; that is, firing at or near the boys in the boat, was the proximate cause, the producing cause, the cause that was primarily responsible for the death of deceased.' . . . 'Defendant's act or omission need not be the immediate cause of the death; he is responsible if the direct cause results naturally from his conduct.'

"Under neither the common law nor our statute is an *accidental killing* murder. *It is not even a felony.* Yet this Court has uniformly held that an accidental killing in the perpetration of or the attempt to perpetrate a robbery or burglary or any other of the enumerated felonies is murder in the first degree. The reason is that any person committing or attempting to commit, any of these major felonies is *motivated by*

*malice* and when the killing of a human being directly results, even though *not intended,* from his malicious act, it is murder because *malice,* the essential element of murder *is present.* The felon's malicious act in perpetrating or attempting to perpetrate, his planned major crime is justly regarded by the law as the causative antecedent of the homicide. In cases of this kind society puts its punitive hand on the person responsible for the legally blamable cause. This doctrine is authoritatively recognized in the law. . . .

"It has been argued that our opinion in the case of Commonwealth v. Moyer and Commonwealth v. Byron, supra, and our opinion in the instant case are 'novel'. They are no more of a 'novelty' than was the opinion of this Court in Commonwealth v. Doris, supra. They are no more 'novel' than was the first decision which ever held that even an accidental killing in the perpetration or attempted perpetration of robbery or burglary is murder in the first degree. That is now the law of this Commonwealth: Commonwealth v. Lessner, 274 Pa. 108, 118 A. 24; Commonwealth v. Kelly, 333 Pa. 280, and 337 Pa. 171, 10 A. 2d 431. They are not as novel as was the first decision at common law that if one shoots at 'A' and misses him and kills 'B', this is murder, because of the previous felonious intent, which the law transfers from one to the other. (Blackstone, Book IV, page 1599, section 201.)

"What Justice CARDOZO said is applicable here: 'when they [judges] are called upon to say how far existing rules are to be extended or restricted, *they must let the welfare of society fix the path, its direction and its distance* . . . The final cause of law is the *welfare of society*\* . . . Justice and general utility,

---

\* We note that the same basic philosophy was expressed by Chief Justice VON MOSCHZISKER in *Commonwealth v. Parker,* 294

such will be the two objectives that will direct our course.' Justice HOLMES said: 'I think that the judges themselves have failed adequately to recognize their duty of weighing considerations of social advantage.'

"*There can be no doubt about the 'justice' of holding that felon guilty of murder* in the first degree who engages in a robbery or burglary and *thereby inevitably calls into action defensive forces against him, the activity of which forces result in the death of a human being.* Neither can there be any doubt about the 'general utility' of a ruling which holds this defendant Almeida guilty of the murder of Officer Ingling, even if it had been established that the bullet which killed that officer was fired by one of the police officers who were returning the fire of Almeida and his confederates and were attempting to prevent their escape. . . .

"*A knave who feloniously and maliciously starts 'a chain reaction' of acts dangerous to human life must be held responsible for the natural fatal results of such acts.* This is the doctrine enunciated by the textbook writers on criminal law, and which has been applied by the courts . . ."

If the decisions of this Court in *Commonwealth v. Moyer and Byron* and *Commonwealth v. Almeida,* which applied long established legal principles to protect law-abiding citizens and law-abiding communities, displeased the people of Pennsylvania, the Legislature could, and according to the majority opinion's view, should have passed an Act changing the law and absolving robbers and other dangerous criminals from a killing which occurred in the perpetration of a robbery, unless one of the robbers fired the fatal shot. Although

Pa. 144, 154, 143 A. 904: ". . . we take judicial knowledge of the fact that offenders of that designation [habitual criminals] have become so general that the law, not only lex scripta but non scripta, must advance to protect society against them."

the Legislature met many times thereafter, namely, January 4, 1949 to April 28, 1949, January 2, 1951 to December 22, 1951, January 6, 1953 to July 27, 1953, January 3, 1955 to May 22, 1956, and January 1, 1957 to June 20, 1957, it did not change the decisions of *Moyer, Byron* and *Almeida* or the basic principles upon which they were predicated.

Furthermore, the majority opinion blandly and blindly ignores the very important fact—the importance and magnitude of which is overpowering—that *Commonwealth v. Almeida* was thereafter affirmed by four decisions of the Supreme Court of Pennsylvania, three of which quoted extensively from that case and based their decision (of guilty of murder) upon the basic principles so clearly and forcefully enunciated and reiterated in the *Almeida* case. These decisions were *Commonwealth v. Phillips*, 372 Pa. 223, 93 A. 2d 455 (1953); *Commonwealth v. Lowry*, 374 Pa., supra (1953); *Commonwealth v. Bolish*, 381 Pa., supra (1955); *Commonwealth v. Thomas*, 382 Pa. 639, 117 A. 2d 204 (1955).

In *Commonwealth v. Lowry*, 374 Pa., supra, the Court affirmed a look-out's conviction of murder and in a unanimous opinion said (page 599): "Where a killing occurs in the course of a robbery, all who participate in the robbery including the driver of the get-away car are equally guilty of murder in the first degree even though some one other than the defendant fired the fatal shot. Com. v. Robb, 284 Pa. 99, 130 A. 302; Com. v. Moyer and Com v. Byron, 357 Pa. 181, 53 A. 2d 736; Com. v. Hough, 358 Pa. 247, 56 A. 2d 84; Com. v. Almeida, 362 Pa. 596, 68 A. 2d 595; Com. v. Thomas, 357 Pa. 68, 53 A. 2d 112; Blackstone, Book 4, pages 192, 193."

*Commonwealth v. Bolish*, 381 Pa., supra (1955) sustained another conviction of felony murder. That

case reaffirmed *Commonwealth v. Almeida*, 362 Pa., supra, and *Commonwealth v. Moyer*, 357 Pa. supra, and predicated its conclusion solely and entirely upon the reasoning and principles enunciated in those cases. The Court held that a man who commits or procures the commission of arson is guilty of murder in the first degree, if the death of the accomplice resulted accidentally and unintentionally from the accomplice's own act in the commission of the arson. The Court, quoting extensively from the *Almeida* and the *Moyer-Byron* cases, said inter alia (pages 510 et seq.) :

"We now come to the main contention of the defendant, viz.: the killing which resulted from this arson could not amount to a so-called felony murder and consequently was not murder under the law of Pennsylvania. Expressed another way, the so-called felony murder doctrine does not apply to the death of an accomplice which resulted from the accomplice's own act in the perpetration of arson . . . Defendant assumes (a) that Flynn was an accomplice and (b) actually set the fire which caused his own death, and based on this premise argues that Flynn's act was an intervening and superseding force which relieved defendant from the killing. . . .

"The theory of the common law was that anyone who committed a common law felony possessed legal malice; and where a killing naturally resulted therein or therefrom, even though the killing was unintentional or accidental, the legal malice was carried over from the original felony and the original felon was guilty of murder. . . .

"Malice express or implied is the criterion and absolutely essential ingredient of murder. Malice in its legal sense exists not only where there is a particular ill will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct,

cruelty, recklessness of consequences and a mind regardless of social duty. Legal malice may be inferred and found from the attending circumstances.

"To summarize: If there was an unlawful killing with (legal) malice, express or implied, that will constitute murder even though there was no intent to injure or kill the particular person who was killed and even though his death was unintentional or accidental: cf. Commonwealth v. Almeida, 362 Pa. 596, 68 A. 2d 595; Commonwealth v. Moyer and Commonwealth v. Byron, 357 Pa. 181, 53 A. 2d 736; Commonwealth v. Guida, 341 Pa. 305, 19 A. 2d 98; Commonwealth v. McLaughlin, 293 Pa. 218, 142 A. 213; Commonwealth v. Robb, 284 Pa. 99, 130 A. 302; Commonwealth v. Lowry, 374 Pa. 594, 98 A. 2d 733; Commonwealth v. Buzard, 365 Pa. 511, 76 A. 2d 394; Commonwealth v. Dorazio, 365 Pa. 291, 74 A. 2d 125; Commonwealth v. Sterling, 314 Pa. 76, 170 A. 258; Commonwealth v. Lessner, 274 Pa. 108, 118 A. 24; Commonwealth v. Exler, 243 Pa. 155, 89 A. 968; Commonwealth v. Drum, 58 Pa. 9; 4 Blackstone, Commentaries 192-193; 40 C.J.S. §13 p. 857, §20 p. 866, §21 p. 868; Wharton, Homicide §2 p. 2, §92 p. 112 (3rd ed. 1907); Maurer, Pennsylvania Criminal Law: Murder §3582 p. 915 et seq., §3689 p. 953 et seq.; 1 Warren, Homicide §74 (Perm. ed. 1938); Clark & Marshall, Crimes §245 (4th ed. 1940). . . .

". . . 'This court said in Commonwealth v. Kelly, 333 Pa. 280, 287, 4 A. 2d 805, "To this Commonwealth one must answer as a malicious criminal for any fatal injury he here causes a human being by anything done by him intentionally or unintentionally during the commission or attempted commission of any of the specified felonies, for malice is the mainspring of his outlawed enterprise and his every act within the latter's ambit is imputable to that base quality. Such a rule

is essential to the protection of human life." In that case we held, as we had previously in Commonwealth v. Lessner, 274 Pa. 108, 118 A. 24, that "when in the commission or attempted commission of a robbery there is 'no break in the chain of events' between the felony and the shooting which caused death, even though 'the discharge [of the gun] was unintentionally caused [by the felon] while struggling with his victim, or with a third party, who came to the latter's assistance,' the defense of accidental killing is inadmissible and the homicide is, under the statute, 'murder of the first degree.'

" 'The doctrine that when malice is the mainspring of a criminal act the actor will be held responsible for any consequence of his act though it was not the one intended was recognized centuries ago when it was held that, quoting from Blackstone, Book IV, page 1599, section 201, "if one shoots at A and misses him, but kills B, this is murder, because of the previous felonious intent, which the law transfers from one to the other." (Italics supplied.)'

"How far Pennsylvania has gone in holding that each of the persons who participated in a criminal act such as robbery is guilty for all the acts of his confederates in furtherance of the common design, is strikingly apparent from Commonwealth v. Doris, 287 Pa. 547, 135 A. 313. In that case one of the robbers killed a policeman during his escape or flight and this killing occurred after the defendant, who was a co-robber, had been seized by and was in the custody of police officers; yet this Court sustained defendant's conviction of murder in the first degree with penalty of death.

"In Clark and Marshall on Crimes (4th Ed.) page 298, the law is thus stated: '§245. Homicide in the Commission of a Felony. (a) In General.—At common

law, malice was implied as a matter of law in every case of homicide while engaged in the commission of some other felony, and such a killing was murder whether death was intended or not. The mere fact that the party was engaged in the commission of a felony was regarded as sufficient to apply the element of malice.

" 'On this principle, it was murder at common law unintentionally to kill another in committing, or attempting to commit, burglary, arson, rape, robbery, or larceny.

" 'The doctrine has repeatedly been recognized and applied in this country, and is to be regarded as still in force, except where it has been expressly abrogated by statute.' . . .

"Commonwealth v. Almeida, 362 Pa., supra, is on its facts so analogous to the instant case and in principle so directly controlling that we shall quote from that exhaustive opinion at some length."*

---

* When the writer of the present majority opinion says (as he also said in his dissenting opinion in *Commonwealth v. Almeida*, 362 Pa., supra) that certain propositions stated in the opinion of the Court in *Commonwealth v. Moyer and Byron* are dictum, it is to be recalled that the Court specifically held in *Commonwealth v. Almeida* that those propositions therein asserted were not dictum. When the writer of the present majority opinion states (as he also did in his dissenting opinion in *Commonwealth v. Almeida*) that his views are supported by *Commonwealth v. Thompson*, 321 Pa. 327, 184 A. 97, and *Commonwealth v. Mellor*, 294 Pa. 339, 144 A. 534, we cannot fail to note that this statement was rejected and refuted, and these cases were clearly distinguished by the Court in its learned exhaustive opinion in *Commonwealth v. Almeida*. When the writer of the present majority opinion cites 5 cases from other jurisdictions to support his views (as he also did in his dissenting opinion in *Commonwealth v. Almeida*), we cannot refrain from once again pointing out that those cases were considered and either distinguished or rejected by the Court in *Commonwealth v. Almeida*. Furthermore, the decisions of this

After quoting therefrom at great length, the Court said (page 519): "*'A knave who feloniously and maliciously starts "a chain reaction" of acts dangerous to human life must be held responsible for the natural fatal results of such acts.* This is the doctrine enunciated by the textbook writers on criminal law, and which has been applied by the courts.' . . .

"*We may thus summarize what has become the settled law of Pennsylvania: If a person with legal malice commits an act or sets off a chain of events from which, in the common experience of mankind, the death of another is a natural or reasonably foreseeable result, that person is guilty of murder, if death results from that act or from the events which it naturally produced.* If the original malicious act was arson, rape, robbery, burglary or kidnapping, the original actor is guilty of murder in the first degree."

If the people of Pennsylvania believed that *Commonwealth v. Bolish, Commonwealth v. Almeida, Commonwealth v. Moyer and Byron,* and *Commonwealth v. Lowry,* were wrongly decided or laid down a principle of law which unjustly protected law-abiding citizens and law-abiding communities, the Legislature could, and according to the majority view should, have passed an Act altering the law when it. met subsequently to these decisions.

*Commonwealth v. Moyer and Byron, Commonwealth v. Almeida, Commonwealth v. Lowry,* and *Commonwealth v. Bolish* were followed by *Commonwealth v. Thomas,* 382 Pa. 639, 117 A. 2d 204, which once again based. its affirmance of felony murder upon the basic

Court which cited cases from other States, as well as text authorities to support their opinions, are so recent that it is unnecessary to again cite or analyze them. See particularly *Commonwealth v. Almeida* and the concurring opinion in *Commonwealth v. Thomas,* 382 Pa., supra.

principles laid down in the *Moyer, Almeida, Bolish* cases, from which it quoted at length. In the *Thomas* case Jackson and the defendant, Thomas, attempted to hold up and rob a grocery store. The owner shot and killed Jackson. This Court held that the defendant, under these facts, was guilty of murder in the first degree. *Commonwealth v. Thomas,* as the majority admit, is factually on all-fours with and unless overruled, directly and unquestionably rules and controls the *Redline* case and sustains Redline's conviction of murder.

What was the basis, what were the reasons and principles for the Court's decision holding Thomas to be guilty of murder? The Court, speaking through Mr. Justice ARNOLD, said, inter alia:

"In applying the felony-murder statute, we have held that the malice of the initial offense attaches to whatever else the criminal may do in connection therewith. 'It makes no difference that [the defendant] . . . and the other conspirators could not know in advance the precise course of events that would follow when they attempted to complete their evil designs': Commonwealth v. Guida, 341 Pa. 305, 310, 19 A. 2d 98.

"If the defendant sets in motion the physical power of another, he is liable for its result. 'Acts should be judged by their tendency under the known circumstances, not by the actual intent which accompanies them. . . . the law requires [men] at their peril to know the teachings of common experience, just as it requires them to know the law. . . . "the test of murder is the degree of danger to life attending the act under the known circumstances of the case" ' . . .' "*He whose act causes in any way, directly or indirectly the death of another, kills him, within the meaning of the law of felonious homicide. It is a*

rule both of reason and the law that whenever one's will contributes to impel a physical force, proceeding from whatever different sources, he is responsible for the result, the same as though his hand, unaided, had produced it . . ." ' *'There can be no doubt about the "justice" of holding that felon guilty of murder* in the first degree who engages in a robbery or burglary and *thereby inevitably calls into action defensive forces against him, the activity of which forces* result in the death of a human being': Commonwealth v. Almeida, 362 Pa. 596, 605, 629, 68 A. 2d 595.

"As has been said many times, *such a rule is equally consistent with reason and sound public policy, and is essential to the protection of human life.* The felon's robbery set in motion a chain of events which were or should have been within his contemplation when the motion was initiated. He therefore should be held responsible for any death which by direct and almost inevitable sequence results from the initial criminal act.

" '. . . Every robber or burglar knows when he attempts to commit his crime that he is inviting dangerous resistance . . . knows that a likely later act in the chain of events he inaugurates will be the use of deadly force against him on the part of the selected victim. *For whatever results follow from that natural and legal use of retaliating force, the felon must be held responsible*': Commonwealth v. Moyer, 357 Pa. 181, 191, 53 A. 2d 736. (Italics supplied).

"The driver of a get-away car is guilty of murder in the first degree where the killing was committed by his accomplices in the course of robbery: Commonwealth v. Lowry, 374 Pa. 594, 98 A. 2d 733.

"In Commonwealth v. Doris, 287 Pa. 547, 135 A. 313, we sustained a conviction of a co-felon for murder in the first degree, even though after the robbery was

completed and the conspirators were trying to effect their escape, defendant's accomplice shot and killed a police officer, at which time defendant was already in the custody of and restrained by police officers.

"In Commonwealth v. Moyer, supra, we held that *it was immaterial whether the bullet killing a third person* (police officer) *came from the defendant's pistol or that of the victim of the robbery.*

"In Commonwealth v. Bolish, 381 Pa. 500, 113 A. 2d 464 (reversed on other grounds), we held a conviction of murder in the first degree to be proper even though defendant's accomplice (in arson) actually set the fire which caused his own death. The defendant there contended that the accomplice's act was an intervening and superseding force relieving the defendant of the killing. We there said: 'Courts have a duty, especially in these days when crime has become so prevalent, to see that the lives, the property and the rights of law-abiding people are protected and consequently must delicately balance the scales of justice so that the rights of the public are protected equally with those of persons accused of crime. . . .

"So, too, in the instant case. That the victim, or any third person such as an officer, would attempt to prevent the robbery or to prevent the escape of the felons, and would shoot and kill one of the felons was 'as readily foreseeable' as the cases where an innocent bystander is killed, even unintentionally, by the defendant's accomplice, or where the victim of the robbery is slain, or where a pursuing officer is killed. *The killing of the co-felon is the natural foreseeable result of the initial act.\* The robbery was the proximate cause of the death. We can see no sound reason*

---

\* Realistically, it is just as if defendant's bullet had ricocheted off the wall and killed his co-felon.

*for distinction merely because the one killed was a co-felon.* It was a killing in the perpetration of a robbery which was 'unquestionably contemplated and callously ignored by the defendant, who most certainly intended to commit a crime which he knew might well give rise to it': Commonwealth v. Sterling, 314 Pa. 76, 80, 170 A. 258."

*Commonwealth v. Almeida, Commonwealth v. Moyer and Byron* and all the other recent felony murder decisions of this Court were again approved and the basic and long established principles enunciated therein were reviewed and reaffirmed in a comprehensive concurring opinion of 14 pages. See *Commonwealth v. Thomas,* 382 Pa. 639, 645.

. *Commonwealth v. Thomas,* 382 Pa., supra, was handed down on September 26, 1955. The Legislature of Pennsylvania met from January 3, 1955 to May 22, 1956, and from January 1, 1957 to June 20, 1957. If the people of Pennsylvania believed that *Commonwealth v. Thomas, Commonwealth v. Bolish, Commonwealth v. Almeida, Commonwealth v. Lowry* and *Commonwealth v. Moyer and Byron* were unjust decisions or laid down principles which improperly or unfairly protected law-abiding citizens from murderers and other dangerous criminals the Legislature could, and, we repeat, under the majority's view should have changed the law, but the Legislature made no change.

### Refutation of Statements and Propositions in the Majority Opinion

It is an indisputable fact that until the cases of *Commonwealth v. Bolish* and *Commonwealth v. Thomas* the writer of the present majority opinion was the only Justice who dissented in or from any of the aforesaid decisions or opinions of the Court. The propositions of law which are adopted by the present majority

opinion have been continuously and vigorously advocated for the last ten years by convicted murderers and have been carefully considered, analyzed and rejected by this Court in their opinions and decisions commencing with *Commonwealth v. Moyer and Byron* and *Commonwealth v. Almeida.*

The specific reason or ground for the present majority opinion—a justifiable homicide—was vigorously urged but was completely and *unequivocally rejected* by this Court in *Commonwealth v. Thomas.* It was thus clearly expressed by the writer of the present majority opinion in his dissenting opinion in *Commonwealth v. Thomas*, 382 Pa., supra, where he said: "I am at a loss to understand how anyone can be found guilty of murder at common law . . . for a . . . justifiable homicide." There are three convincing answers to this question. In the first place, going all the way back to Blackstone, Blackstone says: "If a man, however, does such an act of which the probable consequence may be, and eventually is, death; such killing may be murder, although no stroke be struck by himself and no killing be primarily intended." IV Blackstone's Commentaries, §197, page 1594.

The second convincing answer is that a homicide may be justifiable qua a policeman or one defending his life or home, and felonious qua another person, for, as even Blackstone points out, it is murder to wantonly kill a felon.

The third convincing answer is found in a score of cases hereinabove cited which hold that while an accidental or unintentional killing is excusable or justifiable and is not even a felony, an accidental or unintentional killing which occurs in the perpetration of a robbery, burglary, arson, rape, or kidnapping, is murder. If the majority opinion is correct that a person cannot be guilty of murder in Pennsylvania,

for a so-called justifiable homicide, how can anyone be guilty of murder, as all authorities from Blackstone's day until today agree—and the majority opinion admits—they can, for an accidental or unintentional homicide? All authorities, including the majority opinion, agree that malice is the essential, indispensable ingredient, the hall-mark of murder and that without the doctrine of implied or transferred malice there could not be any felony murder. It is absolutely indisputable that during a robbery *legal malice is present in all the robbers, irrespective of who fired the fatal shot or who was killed!* That is one of the crucial touchstones which the majority have completely overlooked and without which the majority cannot build its house. How then, we repeat, is it possible to draw a logical or realistic or sound or legal distinction—so far as the crime of murder is concerned—between an unintentional or accidental killing in the perpetration of a robbery and what the majority opinion calls a justifiable killing in the perpetration of a robbery since in each case every robber possessed malice during the robbery and the attempted escape!

The reason for the origin, development and application of the felony murder doctrine is *the protection of society.* Without the application of the felony murder doctrine or principle, an unintentional or accidental killing in a hold-up could not amount, in Blackstone's day or today, to murder. Yet (legal) *malice* is, we reiterate, obviously *just as much present in the felons, in a so-called justifiable killing* which occurs in a robbery, *as it is in an accidental or unintentional killing* which occurs in a robbery. Consequently, if the killing occurred in and as a natural result of the robbery, what does it matter who fired the fatal shot or who was killed?

It is clear as crystal that Redline cannot be freed of murder merely by overruling the very recent case of *Commonwealth v. Thomas,* bad as that would be. Even more important it is an indisputable fact that Redline cannot be freed of murder by this Court unless (1) it specifically overrules *Commonwealth v. Almeida,* 362 Pa. and *Commonwealth v. Moyer and Byron,* 357 Pa. as well as *Commonwealth v. Thomas,* 382 Pa.* and also, according to Justice MUSMANNO and Justice COHEN, *Commonwealth v. Bolish,* 381 Pa. supra; and (2) it repudiates and rejects all the basic principles of felony murder which have existed for several centuries and have been constantly iterated and reiterated in the decisions of the Supreme Court of Pennsylvania and particularly in the recent cases of *Commonwealth v. Almeida, Commonwealth v. Moyer and Byron, Commonwealth v. Lowry, Commonwealth v. Bolish* and *Commonwealth v. Thomas;* and (3) it destroys one of the few remaining barriers which furnish some protection to law-abiding communities against murderers, as well as the deterrence of felonious crime by dangerous criminals. All of the aforesaid felony murder cases, particularly *Commonwealth v. Thomas, Commonwealth v. Moyer and Byron* and *Commonwealth v. Almeida,*

---

* From the majority opinion in the present case and from the dissenting opinion of Justice MUSMANNO filed this day in *Commonwealth v. Bolish,* we learn for the first time that an Assistant District Attorney had nolle prossed the murder indictment in *Commonwealth v. Thomas.* We do not have before us the record in the second *Thomas* case, and therefore do not know whether new facts and circumstances justified the actions of the officer who is supposed to protect the public and to obey the mandates of the Supreme Court of Pennsylvania. However, if the Assistant District Attorney caused the murder indictment against Thomas to be nolle prossed in *intentional* defiance of the the opinion of the Supreme Court of Pennsylvania in *Commonwealth v. Thomas,* 382 Pa., he should have been held "in contempt" and *severely* punished.

the latter two of which have been cited and quoted with approval by this Court in recent cases, *directly rule* the Redline murder; and it is impossible to avoid, evade or escape from the fundamental rationale and the basic reasons and the basic principles upon which those decisions were based and those convictions of murder sustained, without expressly overruling all those cases and repudiating and rejecting the basic reasons and principles enunciated therein.

Whether the present majority opinion is considered alone or in conjunction with Justice COHEN'S concurring opinion, the conclusion is inescapable—they have succeeded in making a shambles of the law of felony murder in Pennsylvania.*

How many times do basic principles of law have to be reiterated in order to become the settled law of this Commonwealth? How many times do leading cases have to be cited with approval and approvingly quoted in extenso, in order to become the settled law of Pennsylvania?

It may be trite but it is indisputably true and it is certainly necessary to say that there must be some real stability in our Courts and their decisions, in order to enable businessmen to make contracts, to enable every citizen to know his rights, and every public official to know the powers and limitations of government, and finally, to enable society to protect itself against crime.** SIR EDWARD COKE, Lord Chief

---

* In the majority opinion, *Commonwealth v. Almeida*, like Mohammed's coffin, is suspended between Heaven and earth. However, unlike Mohammed's coffin, which is headed upward toward Heaven, the coffin containing *Commonwealth v. Almeida* is pointed downward in preparation for a speedy flight into the bowels of the earth.

** A couple of centuries ago the punishment inflicted upon a person convicted of a minor offense was so terrible (often death)

Justice of England, thus wisely erected in circa 1620 a beacon light which, until the last few years, has guided lawyers, Judges, businessmen and everyone alike: "The knowne certaintie of the law is the safetie of all". That maxim or standard was inscribed on the walls of Law Schools; more important, it was imbedded for hundreds of years in the minds and thoughts of every (English and) American lawyer and, until recently, of every American Judge. The words of OWEN J. ROBERTS, the learned and distinguished Justice of the Supreme Court of the United States, are particularly appropriate. In *Smith v. Allwright,* 321 U.S. 649, 669, he aptly said: "The instant decision, overruling that announced about nine years ago, tends to bring adjudications of this tribunal into the same class as a restricted railroad ticket *'good for this day and train only'."*

Is this Court going to justly and adequately protect law-abiding communities as we have done for over 100 years; are we going to maintain *principles and standards and decisions* whose "knowne certaintie is the safetie of all", or are we going to mark our decisions "good for this day and train only"?

.

---

that Courts leaned over backwards to devise protection for him. Today the pendulum has swung far in the other direction so that it is society, and not the criminal, which is sorely in need of protection by the Courts. In spite of this the highest Courts in the land are constantly weakening or eliminating the few safeguards which remain to protect law-abiding communities against dangerous criminals.