L LANDRIEU, Judge.
On August 29, 1996, the defendant, Robert M. Myers, A/K/A Robert Williams, was charged with two counts of manslaughter during the perpetration of a felony, namely a violation of the Uniform Controlled Dangerous Substances Law. On March 13, 1997, a twelve member jury found the defendant guilty as charged. On June 27, 1997, he filed a motion for post-verdict judgment of acquittal or in the alternative for new trial. On August 12, 1997, the motion was denied. The defendant waived all delays and was immediately sentenced to serve twenty years at hard labor on each count, with the sentences to run concurrently. His motion to reconsider sentence was denied; this appeal followed.

Facts

Detective Paul Toye testified that on July 18, 1996, he began an investigation of 1118 St. Andrew Street after having received complaints from neighbors over the narcotics hotline that a Cuban male was selling narcotics from the address. Detective Keith Fredericks was assigned the primary responsibility for the surveillance, although Detective Toye and his partner, Officer Joey Thomas, also conducted surveillance from a different location. On the night of July 18th, a white male, later identified as the defendant, arrived at the residence riding a bicycle and wearing a dark T-shirt with dark jeans. He entered the residence with keys. Detective Toye saw no narcotics activity before the defendant | ¡¡arrived. After he arrived, a white female went to the residence. The defendant answered the door and accepted what appeared to be currency. He went back into the residence, came back out, and handed the woman an object. She then left the scene. A short time afterwards, a white male came to the location, and the same chain of events occurred. Shortly afterwards, a black male wearing no shirt arrived, and again the same events. At that point, the officers decided to secure a search warrant for the residence.
Once the warrant was signed, the officers prepared to execute the warrant. At the location, the officers observed a Cuban male in front of the house with no shirt on. It was the first time the officers had seen him at the location. When the man, later identified as Jesse Lopez, saw the police, he fled into the residence slamming the door behind him. Detective Toye, Officer Thomas, Detective Gabriel Favoroth, and Detective Michael Harrison forced the door of the house open, announcing their authority as police officers.
The defendant was apprehended in the den. In the rear of the house, the officers saw that a bedroom door was closed, and that a light was shining under it. The officers believed Lopez had fled into that room. When Officer Thomas opened the door, Lopez fired two shots. Officer Thomas backed out of the room and fell to the floor. Detective Toye saw Lopez had barricaded himself between the bed and the wall with some type of bucket. When Lopez fired at the officer, Toye returned fire and killed him.
Davis Richarme, who managed 1116-1118 St. Andrew Street for his mother, said that the downstairs apartment was rented to the defendant in June at the suggestion of the upstairs tenant, Kirk Hooter. Richarme rented the apartment to the defendant and gave him two months rent free in exchange for making repairs 1 o,on the apartment. Richarme explained that the defendant later brought in Lopez as a co-tenant, but he had given the keys to the defendant. Richarme said the June rent receipt was written to the defendant and the July receipt to Lopez at the defendant’s request, so that there would be a *937 record of both men living there. When Richarme went to the property several times to see the progress, both men were there on those occasions. At no time did he learn that the defendant had moved out, and he assumed he was living there on July 18th.
Detective Fredericks testified regarding his surveillance of the apartment. As did Detective Toye, Fredericks witnessed the defendant make three apparent drug transactions. He never saw Lopez at the scene.
Detective Harrison testified he saw Lopez run into the house when he saw the officers arriving to execute the warrant. Officer Thomas broke the door with a battering ram. After entering the apartment, Harrison heard a door slam as Lopez went into a rear bedroom. Harrison ordered the defendant to the floor when he found him in a frpnt room. Harrison heard gunshots, saw Thomas leave from the house, heard him say that he had been shot, and saw Toye and Favoroth return gunfire. Thomas was taken to the hospital where he later died. When Lopez was determined dead at the scene, the investigation was re-classified as a homicide.
Detective Favoroth testified similarly.
Sergeant Cynthia Patterson, called to the scene after the shooting, conducted a search of the apartment. She found a .25 caliber automatic weapon near the body of Lopez along with six empty shells. Also in that room were: eight rocks of crack cocaine, wrapped up individually; some syringes; a spoon; a crack pipe; some loose marijuana; and other drug paraphernalia. The officer also found some Vicodin pills inside an eyeglass case. In the front room, where the defendant was |4located, a few “roaches” were found in an ashtray.
Cyril Zara, owner of Zara Food Stores, testified for the defense that the defendant did a wide variety of jobs on his properties, that he did very good work, that he was never late or absent, and that he was never drunk or had a hangover. Zara said that he saw the defendant buy beer after work, but he never saw him buy hard liquor.
Joseph Zara, son of Cyril, said that he picked the defendant up in the morning and dropped him off in the afternoon. Sometimes the defendant would come out of the front door, other times he would come from upstairs. The defendant also sometimes stayed on Josephine Street. The witness never saw the defendant take drugs or drink alcohol.
Kirk Hooter, who lived upstairs, said the defendant originally lived with Lopez, but he had moved into the upstairs apartment because he and Lopez continually fought. On the night of the shooting, the defendant got off of work and came to the upstairs apartment before going downstairs to speak to Lopez about a job Lopez had asked him to acquire for him. Hooter knew Lopez sold “street dope,” but he did not know the defendant to be involved.
Tammy Smelley, Hooter’s girlfriend, said she was at his apartment the night of the shooting. She confirmed Hooter’s story.
Sergeant Keith Wehmeier, who prepared the initial incident report, said that the target of the original investigation was a Cuban male.
Officer Russell Philibert testified for the State on rebuttal that he observed the defendant during a drug transaction in the middle of St. Andrew Street on April 19, 1996. When Philibert pulled.up his car, the defendant gave a “heads up,” and peddled off on a bicycle holding money in his hand. The other man, Zachary | ¡¿Brown, was stopped and found to be in possession of eleven rocks of crack cocaine and $830.00. The defendant was not apprehended.

Discussion

The defendant argues the felony manslaughter doctrine is inapplicable under the facts of the case, because his actions did not directly cause the death of either victim.
*938 The Louisiana Supreme Court first addressed the felony murder issue in State v. Garner, 238 La. 563, 115 So.2d 855 (1959). There, the defendant, while involved in an argument with the bartender, lunged at him with a knife, prompting the bartender to pull a gun in self-defense. In shooting at the defendant, the bartender missed, but his bullet struck and killed an innocent bystander. The defendant was charged with manslaughter during the perpetration of attempted murder. He filed a motion to quash. The State opposed the motion, arguing that the defendant had set into motion a train or series of events, the natural cause of which was the death of the bystander, and that there had been no intervening independent force that had divested the defendant of his criminal responsibility.
The Supreme Court affirmed the district court’s grant of the motion to quash, noting that adopting the State’s position “would be amending and enlarging the scope of the statute.” 238 La. at 587, 115 So.2d at 864. The Supreme Court reasoned as follows:
“Whenever the meaning of a statute appears doubtful, it is well recognized that we should seek the discovery of the legislative intent.” In LSA-R.S. 14:30— 31, the meaning of the word “offender” is not spelled out. We feel that its meaning can best be discovered by considering it in association with its accompanying words. In LSA-R.S. 14:31, it is recited that a homicide is committed when the [¿‘offender” is engaged in the perpetration or attempted perpetration of a felony not enumerated in Article 30 or any intentional misdemeanor directly affecting the person. No mention is made therein that the. “offender” is responsible for the result of a self defensive act committed by the person attacked. No intimation is made that the “offender” stands in the shoes of the person protecting his person and property with arms. We believe, as did the trial judge, that the legislative intent in employing the word “offender” contemplated the actual killer. A consideration of the term “offender” in connection with the words accompanying it precludes our affirmation of the theory advanced by the State; it is quite obvious that the Legislature overlooked a situation similar to the instant one.
“It has long been the unshaken rule of this State that penal statutes must be strictly construed and cannot be extended to cases not included within the clear import of its language.”
Garner, 238 La. at 586-87, 115 So.2d at 863-64 (citations omitted).
In State v. Kalathakis, 563 So.2d 228 (La.1990), the Louisiana Supreme Court reaffirmed its reasoning in Gamer. In Kalathakis, the police suspected the defendant and a man named Patrick Langley were manufacturing drugs in a mobile home they shared. During a raid, officers observed a man later identified as Larry Calhoun leaving the trailer. When Calhoun saw them, he began to run. During the ensuing chase, Calhoun turned and shot one officer. Officers returned fire and killed him. Meanwhile, other officers gained entry to the trailer. One officer, looking in through a bedroom window, saw the defendant, gun in hand, poised to fire at the officers when they entered the bedroom. That officer broke the window and ordered the defendant to drop her gun. The defendant was convicted of attempted manufacture of the drug, manslaughter of Calhoun, and attempted manslaughter of the officer who was about to enter the bedroom.
The court of appeal affirmed. As to the conviction for the manslaughter of Calhoun, the court concluded that he died as a direct result of defendant’s act of attempting to manufacture drugs. The court of appeal reasoned that the drug manufacturers’ arming themselves, as part of the overall scheme, set into motion a |7chain of events that created a great risk of harm and that Calhoun’s death was within the *939 ambit of reasonably foreseeable possibilities.
The Supreme Court granted writs and reversed the conviction for manslaughter. The State argued that felony-manslaughter was applicable, because the killing occurred when the defendant was engaged in the attempted manufacture of the drug. The defendant argued that the statute did not contemplate the killing by police officers of a co-perpetrator.
The Court acknowledged that some jurisdictions have adopted the Gamer rationale, also called the “act or constructive act” rule, wherein the felony-murder and felony-manslaughter doctrines are limited to cases in which the conduct that caused the death was the conduct of the defendant, or of his accomplice or confederate, • done in furtherance of the design to commit the felony. 563 So.2d at 231 and n. 3. The' Court rejected the proximate cause theory advocated by the State, quoting with approval the discussion in Note, Recent Cases, 71 Harv.L.Rev. 1565 (1958):
It seems preferable, however, to impose liability only for homicides resulting from acts done in furtherance of the felony. A closer causal connection between the felony and the killing than the proximate-cause theory normally applicable to tort cases should be required because of the extreme penalty attaching to a conviction for felony murder and the difference between the underlying rationales of criminal and tort law. ...Requiring this closer causal connection, although it precludes the imputation of the act of killing under the felony-murder rule, would not relieve a felon from responsibility for homicides committed by a cofelon since one member of the conspiracy is responsible for the acts of his coconspira-tors committed in furtherance of the object of the conspiracy.
Kalathakis, 563 So.2d at 231-32.
The Supreme Court stated the causation doctrine as follows:
A causal relation between the defendant’s conduct and the harm | ¿for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime. Causation is a question of fact which has to be considered in the light of the totality of circumstances surrounding the ultimate harm and its relation to the actor’s conduct. M. Bas-siouni, Substantive Criminal Law, Secs. 5, 5.2 (1978). A defendant should not be held responsible for remote and indirect consequences which a reasonable person could not have foreseen as likely to have flowed from his conduct or from those consequences which would have occurred regardless of his conduct. Id. Kalathakis, 563 So.2d at 231.
The Supreme Court in applying these concepts to the facts of Kalathakis found that the defendant’s conduct in attempting to produce drugs was not a substantial factor in bringing about Calhoun’s death. The Court acknowledged that La.Rev.Stat. 14:31(2)(a) permits a conviction for homicide without proof of the defendant’s intent to cause death or great bodily harm, but it emphasized that the prosecutor is “required to prove that defendant’s conduct was the legal cause of the killing:” 563 So.2d at 232. The Court continued:
Unlike the defendant’s conduct in [State v. Statum, 390 So.2d 886 (La.1980) ] in making sexual advances which caused a minor to jump from the car to her death, [Kalathakis’s] conduct in attempting to produce methamphetamine can hardly be determined to be a substantial factor in the killing of Calhoun. This killing, in the manner which it occurred, was not reasonably foreseeable when [Kalathak-is] set out to manufacture drugs. Moreover, Calhoun’s flight to evade the police and his firing at his pursuers were intervening acts which weakened any causal relationship between [Kalathakis’s] manufacturing of drugs and the killing.
Kalathakis, 563 So.2d at 232.
The present case is virtually indistinguishable from Kalathakis. The defen *940 dant here, as in that case, was allegedly involved in the drug trade; police raided his house; a third person shot and killed a police officer; and that third person was killed in a subsequent gunfight with police. Here as there, the killings, in the manner in which they occurred, were not reasonably foreseeable. Unlike the ^defendant in Kalathakis, whose conviction for attempted manslaughter of the police officer was upheld, the defendant here did not have a weapon when he was found in the front room of the apartment. Also, there was no evidence that the defendant even knew that Lopez had a gun, much less that Lopez would fire at officers who were executing a warrant. Furthermore, the officers admitted that they had not seen Lopez involved in any of the drug transactions observed during their surveillance of the apartment. In fact, they never saw Lopez until he appeared at the apartment just prior to the execution of the search warrant.
The defendant’s theory of the case was that he was not involved in any drug activity. He thus argues on appeal that the evidence was insufficient under the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to prove his guilt in the underlying felony of drug distribution.[1] However, assuming the defendant’s involvement in the apparent drug transactions and his constructive possession of contraband found in the apartment were sufficient under the Jackson v. Virginia standard to prove beyond a reasonable doubt that he perpetrated or attempted to perpetrate a felony under the Uniform Controlled Dangerous Substances Law, we do not believe the State proved beyond a reasonable doubt that Lopez was aiding and abetting the defendant as a principal or co-conspirator in perpetrating or attempting to perpetrate that underlying felony. Therefore, Lopez’s acts in barricading himself in his room and firing upon Officer Thomas cannot be said to have been in furtherance of the defendant’s design to commit the underlying felony.
|inThus, Lopez’s attempt to evade the police and his firing at his pursuers, as were the actions of Calhoun in Kalathakis, were intervening acts that weakened any causal relationship between the defendant’s distribution or attempted distribution of drugs and the killing of Officer Thomas. Likewise, the killing of Lopez, by the police officers, in response to Lopez firing at them, was further removed from the defendant’s drug activity.
Both Gamer and Kalathakis mandate a reversal in this case.[2] Accordingly, the defendant’s convictions and sentences are reversed.
CONVICTIONS AND SENTENCES REVERSED.
KLEES, C.J., CONCURS

. The defendant notes that, unlike in Kala-thakis, there was no controlled purchase ,of drugs from the defendant and that none of the alleged purchasers was subsequently stopped and determined to have had contraband on their persons.

. The defendant's remaining assignments of error are pretermitted.