760 So.2d 310 (2000)
STATE of Louisiana
v.
Robert M. MYERS a/k/a Robert Williams.
No. 99-K-1849.
Supreme Court of Louisiana.
April 11, 2000.
Opinion on Rehearing May 12, 2000.
*311 Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Joseph E. Lucore, New Orleans, for Appellant.
Paul Charles Fleming, Jr., New Orleans, for Respondent.
MARCUS, Justice[*]
Robert M. Myers was indicted by the grand jury for the manslaughter of New Orleans police officer Joseph Thomas and the manslaughter of Jessie Lopez in violation of La. R.S. 14:31. The indictment charged that the manslaughters were committed during the perpetration of a felony, specifically a violation of the Controlled *312 Dangerous Substances Act. After trial by jury, defendant was found guilty as charged. He was sentenced to serve twenty years at hard labor on each count, with the sentences to run concurrently. The court of appeal reversed defendant's convictions and sentences.[1] Upon the state's application, we granted certiorari to review the correctness of that decision.[2]
Evidence at trial established that the New Orleans Police Department received information over its narcotics hotline that a Cuban male was selling crack cocaine at 1118 St. Andrew Street in New Orleans. On July 18, 1996, detectives from the narcotics unit set up a surveillance of the house at that address. Detective Keith Fredericks was assigned primary responsibility for the surveillance, and watched the house from a position directly across the street. Detectives Paul Toye and Joseph Thomas also conducted surveillance from a different location. All three detectives observed a white male arrive at the residence on a bicycle at approximately 8:15 p.m. This white male was wearing a dark t-shirt and jeans, and was later identified as defendant. Defendant entered the residence using a key.
The detectives did not observe any narcotics activity prior to defendant's arrival. However, about fifteen minutes after defendant entered the residence, they saw a woman approach the house and knock on the door. Defendant answered the door and had a conversation with the woman. She handed him what appeared to be U.S. currency and he retrieved an object from inside the house and handed it to her. The detectives observed two other individuals approach the house and make similar transactions. They did not observe a Cuban male on the premises at any time during their surveillance.
Detectives Toye and Thomas sought a search warrant based on the tip from the narcotics hotline and on their own observations of what appeared to be narcotics activity. A search warrant was obtained at 10:09 p.m. Approximately eight officers proceeded to defendant's residence to execute the warrant. Upon their arrival, they observed a Cuban male, later identified as Jessie Lopez, sitting on the front steps. As soon as Lopez saw the officers, he ran inside the house and locked the door behind him. Detectives Toye, Thomas, Michael Harrison, and Gabriel Favoroth pursued Lopez inside the house after announcing themselves as police officers and forcing open the door with a battering ram.
Defendant was apprehended by Detective Harrison in the den. Detective Harrison ordered him to the floor and defendant cooperated. Detectives Toye and Thomas proceeded to the rear of the house, where they observed a closed bedroom door with light shining from underneath it. Believing that Lopez had fled into that bedroom, Detective Thomas opened the door. Lopez immediately fired two shots, one of which hit Detective Thomas in the chest. Detective Thomas backed out of the doorway and fell to the ground in the hallway. At that point, Detective Toye could see that Lopez had barricaded himself between the bed and wall and was hiding behind a bucket. When Lopez continued to fire, Detective Toye shot and killed Lopez. Detective Thomas was taken to the hospital by a fellow officer. He died about an hour later.
The case was re-classified as a homicide investigation once Lopez was determined to be dead at the scene. Sergeant Cynthia Patterson of the homicide division took charge of the investigation. She and Detective Donald Niles conducted a search of the residence. In the bedroom where Lopez was killed they found a .25 caliber automatic weapon and several empty shells near his body. In that same room they also found eight rocks of crack cocaine *313 wrapped in individual packages, and various drug paraphernalia including syringes, razor blades, and a crack pipe. The officers also discovered some Vicodin pills hidden inside an eyeglass case on the bedside table. In several rooms, including the den where defendant was apprehended, they found loose marijuana and partially smoked marijuana cigarettes.
Peter Richarme testified that he managed the duplex at 1116-1118 St. Andrew Street for his mother. He rented the downstairs apartment to defendant, and defendant subsequently brought in Lopez as a roommate. At defendant's request, the receipt for the June 1996 rent was made to defendant, but the receipt for the July 1996 rent was made to Lopez. Mr. Richarme stated that on the two or three occasions he had visited the property, both defendant and Lopez were there. To his knowledge, defendant and Lopez were both living there up until the day of the shooting.
The tenants of the upstairs apartment, Kirk Hooter and Tammy Smelley, also testified. They both stated that defendant had originally lived with Lopez downstairs, but that he had moved upstairs due to a falling out with Lopez. On the night of the shooting, defendant had come inside the upstairs apartment after getting off work, but headed downstairs to speak to Lopez about a job Lopez had asked defendant to secure for him. Ms. Smelley testified that she thought crack cocaine was sold from the downstairs apartment. Mr. Hooter also stated that he believed Lopez was involved in selling narcotics.
The sole issue presented for our consideration is whether there is sufficient evidence to support defendant's convictions for the manslaughter of Officer Joseph Thomas and the manslaughter of Jessie Lopez while engaged in the perpetration of a violation of the Controlled Dangerous Substances Act.
When considering a claim of insufficient evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984).
La. R.S. 14:31 defines the crime of manslaughter to include what is known as "felony manslaughter." The statute provides:
Manslaughter is:
* * *
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person.
This court interpreted the reach of this statute in State v. Garner, 238 La. 563, 115 So.2d 855 (1959). In that case the defendant was involved in an argument with a bartender and lunged at him with a knife. Acting in self-defense, the bartender pulled a gun and fired a shot that missed the defendant but hit and killed an innocent bystander. The defendant was charged with manslaughter during the perpetration of an attempted murder. Although the defendant did not pull the trigger himself, the state's theory was that in lunging at the bartender the defendant had set into motion a series of events that naturally led to the death of the bystander.
In evaluating whether the felony manslaughter doctrine extended to any death that occurred during the perpetration of a felony, the court carefully examined the statutory language. Concluding that adopting the state's theory "would be amending and enlarging the scope of the statute," the court held that the felony manslaughter doctrine only applied to a defendant if he did the act of killing or the act was done by an accomplice in the underlying *314 felony. The court relied on the rule requiring strict construction of penal statutes, and reasoned:
In LSA-R.S. 14:30-31, the meaning of the word "offender" is not spelled out. We feel that its meaning can best be discovered by considering it in association with its accompanying words. In LSA-R.S. 14:31, it is recited that a homicide is committed when the "offender" is engaged in the perpetration or attempted perpetration of a felony not enumerated in Article 30 or any intentional misdemeanor directly affecting the person. No mention is made therein that the "offender" is responsible for the result of a self defensive act committed by the person attacked. No intimation is made that the "offender" stands in the shoes of the person protecting his person and property with arms. We believe, as did the trial judge, that the legislative intent in employing the word "offender" contemplated the actual killer. A consideration of the term "offender" in connection with the words accompanying it precludes our affirmation of the theory advanced by the State; it is quite obvious that the Legislature overlooked a situation similar to the instant one. 238 La. at 585-86, 115 So.2d at 863-64.
The Garner court was constrained to conclude that the defendant was not liable for the death of the innocent bystander because the defendant did not pull the trigger himself and the bartender who did the actual shooting was not acting in concert with the defendant. The court appeared dissatisfied with the particular result mandated by the statute, but recognized that it is "a matter which addresses itself to the lawmakers." 238 La. at 587, 115 So.2d at 864.
The holding of Garner was revisited by this court in State v. Kalathakis, 563 So.2d 228 (La.1990). In Kalathakis, the police conducted a raid on a mobile home shared by the defendant and a man named Patrick Langley who were suspected of using the mobile home to manufacture drugs. When the police arrived on the scene they observed a heavily armed man, later identified as Larry Calhoun, leave the home. Calhoun ran when he realized the officers were approaching, and he was pursued by several officers. Approximately one-quarter mile from the mobile home Calhoun turned and fired at the police. The officers returned fire and killed him. In the meantime, the rest of the police team entered the mobile home. One officer outside could see through a bedroom window that the defendant was armed and poised to fire on the officers when they entered the room. That officer broke the window and ordered the defendant to drop her weapon. The defendant was convicted of attempting to manufacture methamphetamine, the manslaughter of Calhoun, and the attempted manslaughter of the officer who was about to enter the bedroom. The court of appeal affirmed her conviction for the manslaughter of Calhoun, reasoning that by manufacturing drugs and arming herself, the defendant had set in motion a chain of events that resulted in Calhoun's death.
This court reversed the defendant's conviction for felony manslaughter. Although the state urged us to modify Garner and adopt a less restrictive rule of criminal liability in felony manslaughter cases, we stated that "even if we were inclined" to do so, "the evidence in the present case was insufficient for a rational juror to conclude that defendant's conduct related to the manufacturing of drugs was a substantial factor in bringing about Calhoun's death." 563 So.2d at 233. Under the facts presented in Kalathakis, it was simply unnecessary for the court to go beyond the Garner rule.
We explained in Kalathakis that the felony murder doctrine operates as a substitute for the mental element of intent, but the physical element of the defendant's act or conduct in causing the death must still be proved. 563 So.2d at 231. It has long been recognized that "the thing which is *315 imputed to a felon for a killing incidental to his felony is malice and not the act of killing." Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472, 476 (1958). In ascertaining the circumstances under which this physical element may be satisfied, our inquiry begins with the provisions of our felony manslaughter statute.
The Louisiana legislature has defined felony manslaughter as a homicide committed without intent "[w]hen the offender is engaged in the perpetration or attempted perpetration of [an unenumerated] felony." La. R.S. 14:31(A)(2). A criminal statute must be given a genuine construction consistent with the plain meaning of the language in light of its context and the purpose of the provision. La. R.S. 14:3; State v. Leak, 306 So.2d 737, 738 (La.1975). Courts are not empowered to extend the terms of a criminal provision to cover conduct which is not included within the definition of the crime. La. R.S. 14:3; State v. Amato, 96-0606, p. 5 (La.App. 1st Cir.6/20/97); 698 So.2d 972, 979.
We are forced to conclude, as did the Garner court, that by employing the term "offender" in the felony manslaughter statute, the legislature has prescribed that the physical element may only be shown by proof that the defendant or an accomplice performed the direct act of killing. Taken in the context of the surrounding words, the term "offender" plainly refers to the person who performed the act of killing while simultaneously engaged in the perpetration of an unenumerated felony. The "offender" may also be any person jointly engaged in the felonious activity with the actual killer according to the well established rule that all persons concerned in the commission of a crime are liable for the criminal acts of the other participants. La. R.S. 14:24; State v. Anderson, 97-1301, p. 5 (La.02/06/98); 707 So.2d 1223, 1224. However, because the statute defines felony manslaughter to include only those killings committed by one acting in furtherance of a felony, it precludes criminal liability for deaths that are not at the hands of a defendant or his cofelons.
Our approach is in accordance with that taken by the vast majority of states that have considered this issue.[3] Generally referred to as the "agency" theory of liability, this approach holds that "the doctrine of felony murder does not extend to a killing, although growing out of the commission of the felony, if directly attributable to the act of one other than the defendant or those associated with him in the unlawful enterprise." State v. Canola, 73 N.J. 206, 374 A.2d 20, 23 (1977). Therefore, a felon is not liable for his cofelon's death if the co-felon is killed by a victim or a police officer attempting to thwart the crime. See Campbell v. State, 293 Md. 438, 444 A.2d 1034, 1042 (1982); Jackson v. State, 92 N.M. 461, 589 P.2d 1052, 1052 (1979); State v. Crane, 247 Ga. 779, 279 S.E.2d 695, 696 (1981); State v. Severs, 759 S.W.2d 935, 938 (Tenn.Crim. App.1988). On the other hand, the defendant is responsible for any lethal acts perpetrated by his co-felons in furtherance of their common design. See Campbell, 444 A.2d at 1042; Redline, 137 A.2d at 476; People v. Washington, 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130, 134 (1965). Several courts employing the agency theory have noted that any extension of felony murder liability beyond acts committed by *316 the defendant or his co-felon is exclusively a legislative matter. See Severs, 759 S.W.2d at 938; Crane, 279 S.E.2d at 697; State v. Bonner, 330 N.C. 536, 411 S.E.2d 598, 604 (1992).
A minority of jurisdictions have adopted the so-called "proximate cause" theory in felony murder cases[4], but generally only when such a theory is mandated or supported by the jurisdiction's statutory language.[5] Under this theory, a defendant is liable for "any death proximately resulting from the unlawful activitynotwithstanding the fact that the killing was by one resisting the crime." State v. Lowery, 178 Ill.2d 462, 227 Ill.Dec. 491, 687 N.E.2d 973, 975-76 (1997). This theory is often limited by the requirement that the death be a foreseeable consequence of the felony. See People v. Hernandez, 82 N.Y.2d 309, 604 N.Y.S.2d 524, 624 N.E.2d 661, 665 (1993).
Under Louisiana's felony manslaughter statute, the prosecution was required to prove that defendant and Lopez were engaged in the perpetration of a felony not enumerated in Articles 30 or 30.1 and that Lopez killed in furtherance of the commission of this felony. A violation of the Controlled Dangerous Substances Act, La. R.S. 40:961 et seq., is a felony not enumerated in Articles 30 or 30.1. Violations of the Act include a variety of offenses, including distribution of narcotics, possession, and possession with the intent to distribute. La. R.S. 40:967(A), (C).
No less than three officers observed defendant making drug sales from his home. When the residence was searched, individually wrapped pieces of crack cocaine and various drug paraphernalia were found. The evidence also established that both defendant and Lopez resided at the lower apartment on St. Andrew Street. The police had originally received a tip that a Cuban male was selling crack cocaine at that address, and when they arrived to execute a search warrant of the residence they observed a Cuban male dart inside the house. Lopez barricaded himself in the back bedroom with the narcotics and engaged in a shoot-out with police. Lopez was in possession of the crack cocaine at the time of the shooting, and there was testimony from the neighbors that he had been involved in selling narcotics.
Viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt that Lopez was aiding and abetting defendant in one or more of the following violations of the Controlled Dangerous Substances Act: distribution of crack cocaine, possession of crack cocaine or possession with the intent to distribute. As an accomplice with Lopez in the underlying felony, defendant is liable for Lopez's actions in killing Officer Thomas. The court of appeal erred in holding otherwise.
Regarding the second count of manslaughter, there was not sufficient evidence to conclude that defendant, or anyone acting in concert with defendant, was *317 responsible for the death of Lopez. The evidence clearly established that Detective Toye shot Lopez in self-defense. Defendant is not criminally liable for the lethal act of a third party committed in an effort to resist his felony.
Accordingly, we will affirm defendant's conviction and sentence for Officer Thomas, and reverse his conviction and sentence for Jessie Lopez.

DECREE
For the foregoing reasons, we reverse the court of appeal's judgment reversing defendant's conviction and sentence for Officer Thomas, and affirm his conviction and sentence for that offense. We affirm the court of appeal's judgment reversing defendant's conviction and sentence for Jessie Lopez.

ON REHEARING
PER CURIAM.
We amend our original decree to set aside the affirmance of defendant's conviction and sentence for the manslaughter of Officer Thomas and remand to the court of appeal to consider defendant's assignments of error not reached by the court of appeal. Otherwise, defendant's application for rehearing is denied.
NOTES
[*] Knoll, J., not on panel. Rule IV, Part 2, § 3.
[1] 97-2401 (La.App. 4th Cir.05/26/99); 735 So.2d 935.
[2] 99-1849 (La.12/17/99); 751 So.2d 865.
[3] See State v. Jones, 859 P.2d 514, 515 (Okla. Crim.App.1993); State v. Bonner, 330 N.C. 536, 411 S.E.2d 598, 599 (1992); Minnesota v. Branson, 487 N.W.2d 880, 885 (Minn. 1992); State v. Severs, 759 S.W.2d 935, 938 (Tenn.Crim.App.1988); Campbell v. State, 293 Md. 438, 444 A.2d 1034, 1042 (1982); State v. Crane, 247 Ga. 779, 279 S.E.2d 695, 696 (1981); Weick v. State, 420 A.2d 159, 161-62 (Del.1980); Jackson v. State, 92 N.M. 461, 589 P.2d 1052, 1052-53 (1979); State v. Rust, 197 Neb. 528, 250 N.W.2d 867, 875 (1977); Alvarez v. Denver, 186 Colo. 37, 525 P.2d 1131, 1132 (1974); Clark County Sheriff v. Hicks, 89 Nev. 78, 506 P.2d 766, 768 (1973); People v. Washington, 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130, 134 (1965); Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472, 476, 482-83 (1958); Commonwealth v. Moore, 121 Ky. 97, 88 S.W. 1085, 1086 (1905).
[4] See Palmer v. State, 704 N.E.2d 124, 126 (Ind.1999); State v. Lowery, 178 Ill.2d 462, 227 Ill.Dec. 491, 687 N.E.2d 973, 977 (1997); State v. Hernandez, 82 N.Y.2d 309, 604 N.Y.S.2d 524, 624 N.E.2d 661, 662, 664-665 (1993); State v. Oimen, 184 Wis.2d 423, 516 N.W.2d 399, 401 (1994); Mikenas v. State, 367 So.2d 606, 609 (Fla.1978).
[5] See, e.g., Hernandez, 604 N.Y.S.2d 524, 624 N.E.2d at 663-665 (applying proximate cause theory due to statutory language holding a person culpable when, during the commission of a felony, he or an accomplice "causes the death" of a person); Oimen, 516 N.W.2d at 404 (same); State v. Martin, 119 N.J. 2, 573 A.2d 1359, 1370-71 (1990) (noting that legislature intended to adopt the proximate cause theory when it deleted the requirement that the death occur "in furtherance of" the commission of a felony); Mikenas, 367 So.2d at 608-09 (applying proximate cause theory to statute defining felony murder as "when a person is killed in the perpetration of [any enumerated felony] by a person other than the person engaged in the perpetration of ... such felony, the person perpetrating or attempting to perpetrate such felony shall be guilty of murder ...").